Argued and submitted February 5, affirmed in part; reversed in part; remanded with instructions November 24, 1982, respondent Weldin's reconsideration denied January 28, appellants' Kirsten Corporation's and Underdahl's reconsideration denied February 17, petitions for review denied April 6, 1983 (294 Or 682)

KAHN et al,
*Respondents,*

*v.*

WELDIN et al,
*Respondents - Cross-Appellants,*
KIRSTEN CORPORATION et al,
*Appellants - Cross-Respondents,*
*and*
UNDERDAHL et ux,
*Appellants - Cross-Respondents.*

(No. A7809-15903, CA 16778)

653 P2d 1268

Mildred J. Carmack, Portland, argued the cause for appellants - cross-respondents. With her on the briefs were Neva T. Campbell and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Andrew Rich, Hillsboro, argued the cause for respondents - cross-appellants. With him on the briefs was Huffman and Zenger, Hillsboro.

John E. Frohnmayer, Portland, waived appearance for respondents Kahn.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

This complex case began when Henry and Ester Kahn and Kahn Investment Company brought an action to recover various debts owed to them by defendants Kenneth and Miriam Weldin. The Kahns also sought to recover from defendants Kirsten Corporation (Kirsten), Columbia Plating Company (Columbia), American Denture Corporation (American) and Columbia-American Plating Company (Columbia-American), alleging that those corporations had assumed responsibility for the debts. The case was tried to the court. The judgment in favor of Kahns on all claims against all defendants has not been appealed.

The subject matter of this appeal is the trial court's disposition of several cross-claims brought by the Weldins and Kirsten. Kirsten appeals from a judgment denying its claim for indemnity and contribution against the Weldins and its claim for breach of a contract to provide a pollution control system against Kenneth R. Weldin. The Weldins appeal from a judgment denying their claims for damages for breach of an option agreement against intervenors Leif and Marilyn Underdahl and for an order directing the Underdahls to purchase the Weldins' shares in Kirsten. A detailed discussion of the relationships between the individuals and corporations in this case is necessary to understand the issues.

On February 29, 1972, the Weldins purchased the assets and goodwill of Columbia from the Kahns for approximately $18,500 cash and a promissory note for $55,300. The Weldins agreed to make payments to the Kahns on a noncompetition agreement and for management services the Kahns promised to provide. The Kahns retained their ownership of the Columbia stock and later changed Columbia's name to Kahn Investment Corporation. The Weldins operated the metal plating business under the name of Columbia; in October, 1972, they organized a corporation under that name. The new Columbia corporation assumed the Weldins' obligations to the Kahns. Shortly after the sale was completed, the Weldins learned that they needed to upgrade the plant in order to bring Columbia's operations in compliance with pollution control regulations.

During 1972, the Underdahls were facing severe problems. Leif Underdahl was the sole shareholder in American, a company involved in the same business, plating and metal finishing, as Columbia. He and other members of his family were owners of Kirsten, a company organized solely to own the building in which American did business. In 1970, Kirsten's building had sustained significant fire damage. In 1971, the Portland Development Commission (PDC) began pressing the Underdahls to move their business to make way for an urban renewal project. By 1972, Leif Underdahl wanted to sell American and retire but was unable to sell it for a satisfactory price.

PDC informed the Underdahls that, if they moved their business rather than selling it, they would qualify for federal benefits including grants for relocating the plant and Small Business Administration (SBA) loans at low interest rates. In the spring of 1972, the Weldins and the Underdahls began negotiations concerning the combination of Columbia and American at a new location as a solution to their problems. The Weldins' goal was to own and operate a plating business with the combined assets of Columbia and American in a plant that complied with pollution regulations. The Underdahls' goals were to acquire the relocation benefits, to sell American for a satisfactory price and to retire from the plating business.

The Weldins and Underdahls initially agreed on terms for the sale. The parties would contribute their stock in Columbia and American to a new corporation: Columbia-American. Kirsten would be merged into Columbia-American. The Weldins would own 60 percent of Columbia-American, and the Underdahls would own 40 percent. A new plant would be constructed for the plating business. The Underdahls would contribute their relocation benefits, and the Weldins would provide additional funds and engineering expertise. The parties agreed to execute an option for the Weldins to purchase the Underdahls' shares in Columbia-American for $80,000 after Columbia and American were combined and operating in the new plant. The option method of sale was agreed on because the parties could receive relocation benefits only if the Underdahls remained with the business until the relocation was complete. The option method allowed the parties to receive

the relocation benefits and also made final the Weldins' right to purchase Columbia-American.

The final terms of the sale differed from those just described. In May, 1973, when Columbia-American was formed, the Weldins received only 40 percent of the stock and the Underdahls received 60 percent because of an SBA requirement that the Underdahls maintain control of the corporation receiving the loans. On July 10, when the option agreement was signed, the option price was raised to $120,000 to reflect $40,000 of additional relocation funds to be contributed by the Underdahls. The parties then learned that Kirsten, the owner of American's building, was the only entity eligible for relocation funds. Therefore, on December 24, 1973, Columbia-American was merged into Kirsten, and the Underdahls received 63 percent of Kirsten stock and the Weldins received 37 percent.

From 1973 to 1977, while the new plant was under construction, the parties' roles remained static. Leif Underdahl retained the profits and received a salary from American and became a director and vice-president of Kirsten. Although Kenneth Weldin continued to draw a salary from Columbia, his major duties were the control and management of Kirsten and the supervision of the new plant construction. He became a director and president of Kirsten; Miriam Weldin became a director and secretary-treasurer.

In his role as supervisor of the plant construction and manager of Kirsten, Weldin entered into a series of transactions creating additional debts to the Kahns. He arranged for the purchase of three parcels of land as a site for the plant. As a result of SBA and PDC restrictions on the amount of expansion permitted through the use of relocation funds, Weldin acquired in his own name a parcel that became Kirsten's parking lot. Weldin borrowed $20,000 of the funds for the lot from the Kahns, who took a note and mortgage. The Weldins borrowed $10,000 from the Kahns to purchase equipment for the new plant. Kenneth Weldin prepared the specifications and arranged for the submission of bids for construction of the plant's pollution control system. Weldin, as president of Columbia, arranged for Columbia, as subcontractor of the successful bidder,

to provide the design and installation of the system. When installed, the system failed to meet the specifications.

The Kahns continued to provide management services and to supervise the operation of Columbia. Columbia became further indebted to the Kahns for the noncompetition agreement payments, salaries and deferred compensation.

By April 1, 1977, both Columbia and American had moved to the new plant and combined their assets into one plating business operated by Kirsten. However, the companies maintained separate billing and accounting until after the beginning of the new fiscal year on July 1, 1977. On July 15, 1977, the Weldins attempted to exercise their option to purchase the Underdahls' shares in Kirsten. The Underdahls refused.

On November 28, 1979, the trial court entered judgment for the Kahns against all defendants, jointly and severally, for $164,425.88, plus interest at 10 percent per annum, based on the amounts due on the Weldins' promissory note for their purchase of Columbia, the Kahns' personal loans to the Weldins, the noncompetition agreement, deferred compensation and salary and ordered foreclosure of the Weldins' mortgage on the parking lot. The judgment also required defendants to pay the Kahns' attorney fees and costs of $32,035.30.

On June 9, 1980, Kirsten agreed to pay the Kahns $195,000, plus interest, in return for their title to the parking lot and their agreement not to execute the judgment against Kirsten. On the same day, the Weldins paid the Kahns $15,000 for the Kahns' covenant not to execute the judgment against the Weldins individually. In the agreements, the Weldins and Kirsten reserved the right to seek contribution from each other.

In its pleadings, Kirsten raised the following claim:

"By way of Cross-claim, Kirsten alleges that Kenneth R. and Miriam Weldin had no authority to enter into any contracts with Kahns for or on behalf of Kirsten. In the event that Kirsten is found to be liable to the Kahns in any

amount, Weldins are liable to Kirsten in the same amount plus its attorney's fees incurred in defending against the Kahn claim."

Kirsten assigns as error the trial court's refusal to enter judgment for Kirsten on this indemnity claim. We affirm.

■    The Weldins raise two procedural challenges to this assignment of error. They argue that Kirsten did not preserve its indemnity claim, because it failed to raise the issue in its motion for a new trial. Kirsten was entitled to appeal from the judgment under ORS 19.020. A motion for a new trial is not a prerequisite to an appeal. *National Council v. McGinn,* 70 Or 457, 462, 138 P 493 (1914).

■    The Weldins also argue that Kirsten failed to plead and prove its cross-claim for indemnity. Common law indemnity has three elements: (1) the claimant has discharged a legal obligation owed to a third party; (2) the defendant was also liable to the third party; and (3), as between the claimant and defendant, the defendant ought to discharge the obligation. *Ore-Ida Foods v. Indian Head,* 290 Or 909, 919-20, 627 P2d 469 (1981). The Weldins contend that because Kirsten neither pleaded nor proved that it had paid the judgment to the Kahns, thus discharging the legal obligation, it was not entitled to indemnity.

■ ■    Kirsten's cross-claim was brought under ORCP 22B(2), which provides:

> "A cross-claim may include a claim that the defendant against whom it is asserted is liable, *or may be liable,* to the defendant asserting the cross-claim for all or part of the claim asserted by the plaintiff." (Emphasis supplied.)

The purpose of the rule is to promote the expeditious and economical adjudication in a single action of the entire subject matter arising from a set of facts, including claims contingent on the determination of other issues in the case. *See Providential Develop. Co. v. United States Steel Co.,* 236 F2d 277, 281 (10th Cir 1956) (construing identical language of FRCP 13(g)). To require a defendant who raises an indemnity cross-claim to plead and prove actual discharge of a judgment before the judgment is entered against the defendant raising it would contravene the purpose and destroy the usefulness of the cross-claim rule. Kirsten's

indemnity claim was properly presented, was decided in the trial court's judgment and is properly before us for review.

On the Kahns' request, the trial court made special findings relating to their claims against defendants. The only special finding concerning Kirsten's liability for the debts stated:

> "Kirsten made no attempt to keep separate the affairs of Columbia Plating Company or to preserve the capital and goodwill of Columbia for its creditors. Yet Kirsten accepted the benefit of the goodwill and assets of Columbia."

Because defendants did not request special findings on their cross-claims, the trial court disposed of Kirsten's indemnity cross-claim in its conclusions of law and judgment in favor of the Weldins. From the judgment that Kirsten was not entitled to indemnity, we can infer that the trial court decided that Kirsten failed to prove that, as between the Weldins and Kirsten, the Weldins ought to have paid the judgment.

Kirsten argues that the Weldins ought to have paid the judgment as a matter of law. It reasons as follows: Kirsten was held liable for the debts only because it had failed to keep separate and preserve Columbia's assets for creditors while accepting the benefits of Columbia's goodwill and capital; the Weldins had breached their fiduciary duties to Kirsten by failing to disclose to the Underdahls, Kirsten's majority stockholders, the debts incurred before the combination of Columbia and American into Kirsten and by exceeding their authority as officers of Kirsten while incurring further debts; the Weldins' breach of their fiduciary duties caused Kirsten to fail to preserve and keep separate Columbia's assets for creditors; therefore, the Weldins ought to have paid the judgment.

■ Kirsten failed to establish that as a matter of law, it was entitled to indemnity. Assuming, without deciding, that the Weldins incurred the debts to the Kahns in their capacity as individuals or by exceeding their authority as directors and failing to disclose those debts to Kirsten, no evidence indicates that the Weldins' actions *caused* Kirsten and the Underdahls to accept the benefits of Columbia's assets. Further, given that the Underdahls' goal in the

transaction was to combine American and Columbia into Kirsten to receive relocation benefits and ultimately to receive a satisfactory price when selling their interest in Kirsten to the Weldins, the trial court could reasonably infer that the Underdahls would have had no incentive to preserve and keep separate Columbia's assets, even if the Weldins had disclosed their debts to the Kahns. This is so because, under the option agreement, the Weldins would ultimately own all of Kirsten's stock and be responsible for all of Kirsten's debts.

Kirsten cross-claimed for contribution from the Weldins for two-thirds of the amount it had agreed to pay the Kahns for the covenant not to execute the judgment. The trial court made no special findings relating to contribution but denied Kirsten's cross-claim in its judgment. Kirsten's contribution claim sounds in equity and our review is *de novo*. ORS 19.125. We reverse.

■ A judgment debtor who pays "more than his proportion" of the judgment is entitled to contribution from the other judgment debtors. ORS 18.430. No Oregon cases construe the "more than his proportion" language. The Weldins argue that the statute does not require an equal division of the judgment among judgment debtors but contemplates contribution based only on the relative benefits the judgment debtors received in the transaction that gave rise to their liability. Thus, in the present case, the Weldins argue that because Kirsten received 100 percent of the benefits from the debts to the Kahns, Kirsten was not entitled to contribution. In support of their argument, the Weldins cite *Lamb-Weston et al v. Ore. Auto. Ins. Co.*, 219 Or 110, 341 P2d 110, 346 P2d 643 (1959), in which the court divided an insured loss between two insurance companies on the basis of the relative benefit each company had received from its insured. In *Lamb-Weston* the relative benefits were easily established by the liability limits of each company, because the benefits, the insurance premiums, were directly related to the liability limits.

We believe the *Lamb-Weston* rationale should apply in the present case. The proportional benefit rule is well stated in 18 Am Jur 2d 36, *Contribution,* § 24 (1965):

"Since the right to contribution is inherently equitable in nature, the rule logically follows that where the co-obligors have received unequal benefits from the common obligation, the portion of the contribution that each must bear is according to the benefit that each has received. While, in the absence of proof to the contrary, it is presumed that all the co-obligors were benefited in equal degree by the consideration received, this presumption is subject to rebuttal by proof that there was actually an inequality of benefits received. Thus, where several persons borrow money jointly but it is established that, individually, they received unequal parts of that money, they are liable to contribute, not equally, but in proportion to the amounts actually received by them. * * *" (Footnotes omitted.)

The question is whether the Weldins have met their burden to prove that Kirsten had received more than its proportionate share of the benefits from the Kahns' loans and services.

To answer that question, we must first decide which judgment debtors are in the group from which contribution may be obtained. Six defendants were held liable for the debts to the Kahns: Kenneth Weldin, Miriam Weldin, Kirsten, American, Columbia and Columbia-American. The rule in equity is that insolvent judgment debtors do not enter into the apportionment for contribution. *Mansfield v. McReary*, 263 Or 41, 51, 497 P2d 654, 501 P2d 69 (1972). Columbia, American, and Columbia-American were absorbed into Kirsten and were not in existence at the time of the trial. They have no separate assets and are not to be included in the contribution apportionment. Kirsten is considered one party for the purpose of contribution.[1] Similarly, because the Weldins jointly incurred the debts to Kahns, they should be considered one party.

---

[1] We do not decide that judgment debtor corporations that were absorbed into another judgment debtor corporation will never be included in the contribution apportionment. For example, if in the face of a pending or anticipated contribution claim a merger is undertaken and the record indicates that the purpose of the merger was to reduce the corporations' liability for contribution, an argument could be made for disregarding the merger for the purposes of the contribution apportionment. In this case, the purpose of the merger was completely unrelated to Kirsten's contribution claim.

██ Only two parties are included in the contribution apportionment, the Weldins and Kirsten. Therefore, we presume that each party must bear 50 percent of the judgment, unless the Weldins proved that Kirsten received more than 50 percent of the benefits from the transactions with the Kahns. The total principal owed to the Kahns for the assets and goodwill of Columbia, the noncompetition agreement, the loans, deferred compensation and salary was $119,572.91. The Weldins introduced evidence that the $30,000' in loans and $7,000 worth of Columbia's assets directly benefited Kirsten. Although other evidence supports the inference that Kirsten benefited indirectly from the goodwill of Columbia, from the Kahns' services for Columbia and from the noncompetition agreement, the value of those benefits is not in evidence. The Weldins failed to rebut the presumption of equal benefits; therefore, the Weldins and Kirsten must each bear 50 percent of the judgment.

The judgment was entered on November 20, 1979, for $164,425.88, plus interest at 10 percent, and for $32,035.30 in attorney fees and costs. On June 9, 1980, when the Kahns, the Weldins and Kirsten entered into their agreements not to execute on the judgment, the amount due on the judgment was $205,515.86.[2] For reasons not very clear to us, defendants agreed to pay $210,000 for the covenants not to execute: $15,000 from the Weldins and $195,000 from Kirsten.[3] The proportional share of each party is $105,000, and Kirsten is entitled to $90,000 contribution from the Weldins: $45,000 from Kenneth R. Weldin and $45,000 from Miriam J. Weldin. *See Mansfield v. McReary, supra,* 263 Or at 47-8 (formula for contribution amounts).

Kirsten cross-claimed against Columbia and Kenneth Weldin alleging that they had breached their contract to design and install a pollution control system for Kirsten. The trial court's finding relating to this issue states that Columbia was liable for breach of contract but that Kenneth Weldin was not. Kirstin assigns as error the trial

---

[2] Simple interest at 10 percent per annum on $164,425.78 from November 20, 1979, to June 9, 1980, totals $9,054.68.

[3] The Weldins actually paid $15,000, while Kirsten eventually paid $195,000 in principal and $2,812.50 in interest.

court's failure to enter judgment against Kenneth Weldin for damages for breach of contract. We affirm.

Kirsten based its assignment of error on these undisputed facts. Kenneth Weldin prepared the specifications and arranged for the submission of bids for the design and installation of the pollution control system. Environmental Conditioners was the successful bidder. Weldin signed an agreement that Columbia, as subcontractor for Environmental Conditioners, would provide the actual design and installation of the system. He designed and supervised the installation of the system, but it failed to meet the specifications. Columbia-American and Kirsten as its surviving corporation were third-party beneficiaries to the agreement.

The issue is whether Weldin was a party to the contract. Kirsten argued that his affirmative allegation in a pleading conclusively established that he was a party to the contract in his capacity as an individual. Weldin's pleading stated:

> "That prior to August 22, 1974, Columbia and Kenneth R. Weldin entered into a contract with Environmental Conditions whereby they agreed to build and install a pollution control device for the sum of $135,000.00 less the cost of services provided by Environmental Conditions as set forth in a copy of the memorandum of said agreement attached as Exhibit A of Kirsten's further answer and cross-claim against Weldins and plaintiffs."

However, the memorandum of the agreement, specifically included in the same pleading by reference, clearly shows that the parties to the contract were Columbia and Environmental Conditioners and that Weldin signed the agreement in his capacity as president of Columbia.

From Kirsten's point of view, the pleading was at best inconsistent and at worst established that Weldin signed the contract only in his capacity as president of Columbia. Like admissions of fact in a superseded pleading, the admission in an inconsistent pleading is not binding on the party making the admission but is merely evidence of the fact admitted. *Cf. Yates v. Large,* 284 Or 217, 223, 585 P2d 697 (1978) (superseded pleadings). Consequently, the trial court could rely on other evidence in the record to

conclude that Weldin signed the contract only in his capacity as president of Columbia. An officer of a corporation who acts within the scope of his authority, discloses his representative capacity to the other party and makes a contract in the corporation's name is not liable for its breach. *Cf. Porter Const. Co. v. Berry, et al,* 136 Or 80, 298 P 179 (1931) (contract liability of agent). The trial court did not err in failing to hold Kenneth Weldin liable for breach of the contract to design and install a pollution control system.

■ The Weldins cross-claimed against the Underdahls for breach of their option agreement, alleging that the Underdahls had wrongfully failed to sell their shares in Kirsten to the Weldins. The trial court entered a general finding that the Weldins had not met their burden of proof. The Weldins assign error to the trial court's judgment denying their cross-claim. We reverse.

On July 15, 1977, the Weldins attempted to exercise the option by tendering a check for $2,000 and a promissory note for $70,000 to the Underdahls in conformance with the terms of the option agreement. The Underdahls rejected the tender and refused to sell their shares in Kirsten. They argue that their failure to perform the option contract was justified for two reasons. First, they claim that the Weldins breached several terms of the agreement governing the combination of Columbia and American into Kirsten, of which the written option agreement was a part. The Underdahls alleged that the Weldins had failed to complete the new plant and move American in a timely manner, failed to supply an effective pollution control system and failed to disclose the Kahn debts. However, the timeliness of the plant's completion, American's move and the pollution control system problems are irrelevant to the exercise of the option, and the Kahn debts are relevant only if they affected the Weldins' ability to perform their obligations under the option contract. The Underdahls contend that they believed the financial burdens created by the problems with the pollution control system and the Kahn debts rendered the Weldins financially incapable of purchasing the Underdahls' stock. No evidence provides a factual basis for the Underdahls' belief, and they admit that they failed to inquire about the Weldins' financial

ability to purchase the stock. Therefore, the Underdahls were not justified in rejecting the tender on the basis of the Weldins' alleged breach of their duties under the oral agreement.

The Underdahls also argue that the Weldins had failed to exercise the option within the time limit in the option agreement that provided:

"* * * Kenneth R. Weldin and Miriam J. Weldin shall have a period of sixty (60) days after the *operations* of Columbia-American Plating Co., a corporation, and the American Denture Corporation, American Plating Division are *combined and operating* within the new plant facilities within which to exercise this option." (Emphasis supplied.)

The Weldins attempted to exercise the option on July 15, 1977. The physical assets of Columbia and American were combined at the new plant into one plating operation by April 1, 1977. The Underdahls argue that the 60-day limit began to run on April 1, 1977, and that, therefore, the Weldins' tender was not timely. American and Columbia maintained separate financial records and billings until after June 30, 1977. The Weldins argue that the time limit began to run after June 30, and that their tender was timely.

Although the terms "operations" and "combined and operating" are ambiguous when applied to the facts of this case, neither party introduced extrinsic evidence to clarify their meaning. Although, as a general rule, the construction of a contract is a matter of law, *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978), Oregon courts "* * * have consistently held that if the agreement is ambiguous, its meaning is a matter to be decided by the trier of facts when * * * extrinsic evidence is received. * * *" *Meskimen v. Larry Angell Salvage Company*, 286 Or 87, 92-3, 592 P2d 1014 (1979). No Oregon cases, however, directly address whether the construction of an ambiguous contract, when no extrinsic evidence has been introduced, is a question of fact or law. We infer from rules above that, in the absence of extrinsic evidence, as here, the construction of an ambiguous contract is a question of law. *See Lockwood v. Wolf*

*Corp.,* 629 F 2d 603 (9th Cir 1980); *Schuler-Haas Elec. Co. v. Aetna Cas. & Sur. Co.,* 40 NY2d 883, 357 NE2d 1003, 389 NYS2d 348 (1976); *Hartford Accident & Indemnity Co. v. Wesolowski,* 33 NY2d 169, 305 NE2d 907, 350 NYS2d 895 (1973); *Murray v. Western Pacific Insurance Company,* 2 Wash App 895, 472 P2d 611 (1970).

On April 1, 1977, after Columbia and American had moved to the new facility, they were clearly "operating within the new plant." Further, their "operations" were "combined" with respect to their physical assets and the plating process. The companies' "operations" were not "combined," however, for all purposes. The companies' financial records and billings, an integral part of their "operations," were not "combined" until after June 30, 1977. Therefore, we conclude that the 60-day limit did not begin to run until after June 30, 1977, the Weldins' tender was timely, and the Underdahls were not justified in refusing to comply with the terms of the option agreement. The trial court erred in denying the Weldins' cross-claim for breach of the option contract.

Because the trial court decided that the Weldins had not proved that they were entitled to relief, it did not reach the question of damages. The option price was subject to adjustments for Kirsten's cash, accounts receivable, inventory and other assets and obligations. The present record is sufficient for the trial court on remand to resolve the factual disputes on this issue and to award the amounts, if any, that the Weldins proved as damages.

The Weldins also assign as error the trial court's judgment denying their claim for an order directing the Underdahls to sell to the Weldins their shares in Kirsten. ORS 57.595; *Delaney v. Georgia-Pacific Corp.,* 278 Or 305, 564 P2d 277 (1977). The Weldins' assignment of error and subsequent arguments in their brief, however, make it clear that they considered this claim to be in the alternative, rather than in addition, to their claim for damages. Because we have decided that the Weldins are entitled to the damages, if any, that they have proved, we need not review their stock purchase claim.

Affirmed in part; reversed in part; and remanded with instructions that the trial court enter judgment in

favor of Kirsten Corporation against Kenneth R. Weldin for $45,000 and Miriam J. Weldin for $45,000 and judgment in favor of Kenneth R. Weldin and Miriam J. Weldin for damages to be determined for breach of the option contract against Leif H. Underdahl and Marilyn Underdahl.