RODNEY K. BURGESS, III and CAROLE JANE BURGESS, Plaintiffs-Appellees, *v.* FRANK MOTOSHI ARITA, LINDSEY TAMIO ARITA, DOMINIS GARRIDA ANDERSON, and JEAN MILLICENT ANDERSON, Defendants and Third-Party Plaintiffs-Appellants, *v.* GEORGE M. HASEGAWA, Third-Party Defendant-Appellee, and PATRICK M. SHEATHER, Third-Party Defendant

NO. 9655

(CIVIL NO. 53441)

JUNE 10, 1985

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

Defendants Frank Motoshi Arita and Lindsey Tamio Arita (collectively the Aritas) and Dominis Garrida Anderson (Anderson) and Jean Millicent Anderson (collectively the Andersons) (the

Aritas and the Andersons being collectively referred to as Sellers) appeal from the judgment awarding plaintiffs Rodney K. Burgess, III (Burgess) and Carole Jane Burgess (collectively Buyers) damages for the breach of the Deposit Receipt, Offer and Acceptance dated November 30, 1976 (Burgess DROA), and dismissing Sellers' third-party complaint against George M. Hasegawa (Hasegawa). Sellers contend on appeal that (1) Buyers, rather than Sellers, breached the Burgess DROA, (2) if Sellers breached the DROA, Buyers were entitled to nominal damages only, (3) the award of attorney's fees to Buyers was excessive in amount, and (4) the trial court erred in dismissing Sellers' third-party complaint against Hasegawa. We affirm the judgment, except the award of attorney's fees which we modify.

The Trustees of the Estate of Bernice Pauahi Bishop (Bishop Estate) are the fee simple owners of the Kahuhipa Subdivision originally consisting of seventeen industrial lots. S & E, Inc. (S & E), a Hawaii corporation, is the master lessee of the subdivision for a term scheduled to expire on August 31, 1998.

Heeia Development Co. (Heeia), a general partnership consisting of three partners, constructed the subdivision site improvements. Two of Heeia's partners are associated with S & E, one of them being Hasegawa, who, together with his family, owns a 50% interest in S & E. The costs of the improvements were to be paid to Heeia by the lessees of the individual lots, although S & E remained primarily liable therefor.

On August 23, 1973, Bishop Estate and S & E, together as joint lessors, leased Lots 1225 and 1226 of the subdivision to the Andersons for a term of 55 years commencing September 1, 1973. The lease rent was fixed for the first 25 years. The lease required the lessee to construct an industrial-commercial type building having a value of not less than $50,000 on each of the lots within 36 months from September 1, 1973. The lease further required the written consent of the joint lessors for the lessees to assign the lease, to sublet, or to part with possession of the whole or any part of the demised land. ·

The pro rata costs of subdivision improvements assessed to Lots 1225 and 1226 totaled $37,950. The Andersons made a down payment of $9,487.50 and executed two promissory notes totaling $28,462.50 to Heeia. The unsecured notes required the payment

of three annual installments of $9,487.50 each beginning September 1, 1974.

On May 22, 1974, the Andersons assigned 50% of the leasehold interest in Lots 1225 and 1226 to the Aritas. On July 17, 1974, Lots 1225 and 1226 were consolidated and designated as Lot 1576. Consequently, under the lease, a building having a value of not less than $100,000 was required to be built on Lot 1576.

Upon the request of S & E, Bishop Estate on April 6, 1976, granted a one-year extension of the building construction deadline. Under the extension, construction had to commence prior to March 1, 1977 and be completed by September 1, 1977, and S & E was "to withhold consent of sublease assignment until construction on [Lot 1576] is completed, unless the sublessees wish to renegotiate the sublease prior to such assignment."[1] Plaintiffs' Exhibit 7. In turn, S & E granted Sellers an extension requiring the commencement of construction by January 1, 1977 and completion by June 1, 1977.

Under the Burgess DROA dated November 30, 1976, Sellers agreed to sell and Buyers agreed to purchase the leasehold for $74,200, payable $15,000 down and the balance of $59,200 by a two-year agreement of sale (A/S). The Burgess DROA provided, *inter alia:*

> 3. The obligations of Buyer and Seller hereunder are conditioned upon obtaining all necessary consents of third parties. Buyer and Seller shall cooperate and take all reasonable action to obtain such consents.

> 4. Property taxes, lease rents, . . . shall be prorated as of: (1) the date of recording of the conveyance required hereby[.]

> 5. Buyer and Seller shall perform all their obligations set forth herein on or before 1-20, 1977. Buyer and Seller both agree that this time may be extended for a period of 30 days at the discretion of the Seller's Broker[.]

> 6. Buyer shall be given occupancy of the property (on the date of recording of the conveyance to Buyer . . .)[.]

---

[1] Bishop Estate considered S & E as its lessee under the master lease, the leases of the subdivision lots from Bishop Estate and S & E, as joint lessors, as subleases, and the tenants of such lots as sublessees.

The Burgess DROA also provided that the transaction would be closed in escrow by American Abstract & Escrow (American Escrow).

Buyers deposited $15,000 in escrow. Sellers and Buyers executed the A/S dated January 21, 1977. American Escrow forwarded to S & E the executed A/S to which was appended a consent to the A/S to be executed by S & E. By letter dated February 4, 1977, S & E refused its consent indicating that no consent would be forthcoming until the construction on Lot 1576 was completed.[2]

Thereafter both Sellers and Buyers exerted their efforts to consummate the transaction and impliedly extended the closing date. On September 20, 1977, Bishop Estate decided to increase the lease rental since the building construction deadline of September 1, 1977 had not been met.[3] On November 22, 1977, through the efforts of Buyers' attorney, Bishop Estate approved a further 12-month building construction time extension and rescinded the lease rental increase.

In the interim, on September 29, 1977, Walter C. Decker (Decker), President of Aloha Candle Company, Inc., submitted an offer to Anderson to purchase the leasehold for $90,000. Receiving no response, on November 25, 1977, Decker wrote to Anderson stating "please give me a price and I will let you know within 24 hours if I can meet it." Plaintiffs' Exhibit 47. Anderson telephoned Decker to tell him that he had an offer for $135,000. Decker said he would be willing to pay $136,000 and Anderson advised him to put it in writing. On November 30, 1977, Decker submitted a Deposit Receipt, Offer and Acceptance for $136,000 which Anderson accepted on December 2, 1977 (Decker DROA). On December 28, 1977, Sellers assigned the leasehold to Decker with S & E's consent.

---

[2] Hasegawa testified that one of the reasons S & E refused its consent was that Sellers had not paid to Heeia the last installment of $9,487.50 on the promissory notes which were due on September 1, 1976.

[3] In the interim, Sellers had not paid the semi-annual lease rents due on March 1 and September 1, 1977.

On September 21, 1977, S & E filed a complaint (Civil No. 52606) against Sellers for breach of the lease. The complaint alleged the following defaults: (1) failure to pay the lease rent; (2) non-payment of the Heeia promissory notes which had been assigned to S & E; and (3) breach of building construction requirement. S & E prayed for cancellation of the lease, monetary damages, interest, costs, and attorney's fees. Civil No. 52606 was eventually dismissed.

On December 30, 1977, Buyers filed this action against Sellers alleging breach of contract and praying for specific performance,[4] damages, costs, and attorney's fees. On January 31, 1978, Sellers answered and counterclaimed for damages. On July 17, 1980, Sellers filed a third-party claim against Patrick M. Sheather[5] and Hasegawa.

After a bench trial, on June 29, 1983, the trial court entered its "Findings of Facts, Conclusions of Law and Decision" ruling in favor of Buyers and against Sellers and its "Findings of Fact, Conclusions of Law and Order Granting Third-Party Defendant George M. Hasegawa's Motion to Dismiss Third-Party Complaint."[6] On September 12, 1983, a judgment was filed and Sellers timely appealed.

## I. SELLERS' BREACH

Although Sellers challenge 22 of the 38 Findings of Fact and eight of the 15 Conclusions of Law of the trial court, their attack is primarily directed to Finding of Fact 19 which states in relevant part:

Defendants [Sellers] . . . were in breach of the contract from and after February 4, 1977 continuously through the time of their execution of a DROA with Walter Decker on December 2, 1977 which constituted a separate breach.

Sellers claim that they were never in breach of the Burgess DROA. We agree with Sellers that they were not in breach on February 4, 1977 when S & E refused to consent to the A/S. However, we find no error in the trial court's finding that Sellers were in breach upon their executing the Decker DROA on December 2, 1977.

---

[4] Buyers dropped their request for specific performance before trial. *See* Trial Memorandum filed June 25, 1982, Record Vol. 3 at 55, 69.

[5] Patrick M. Sheather was the real estate agent involved in the transaction. By stipulation and order filed on October 8, 1982, the third-party complaint was dismissed with prejudice as to Patrick M. Sheather. *See* Record Vol. 3 at 229.

[6] After the close of taking of the evidence, Hasegawa orally moved to dismiss the third-party complaint. We assume that this motion was made pursuant to Rule 41(b), Hawaii Rules of Civil Procedure (1981).

There is no dispute that the parties were unable to close the transaction as scheduled for the want of S & E's consent.[7] The consent was withheld mainly because the construction deadlines had not been met. Sellers and Buyers blame each other for the failure to meet the deadlines. However, the Burgess DROA neither involved the sale of any building nor required any construction by Sellers, yet barred Buyers from occupancy prior to the recordation of the conveyance documents. As characterized by Don Jeffrey Gelber (Gelber), Buyers' then attorney, it was a "chicken or egg" problem.

Sellers assert that since the obligations of the parties were conditioned upon obtaining all necessary consents of third parties and the consents were not obtained by the stipulated closing date of January 20, 1977 or within thirty days thereafter, the condition was not satisfied and the Burgess DROA was unenforceable. The evidence in the record indicates otherwise.

The trial court properly found that "both parties, by their actions intended [the closing date] to be extended until [Sellers] acquired the necessary consent."[8] Finding of Fact 16. When Gelber succeeded in obtaining from Bishop Estate a further extension of the construction deadline and rescission of the lease rental increase on November 22, 1977, the Burgess DROA transaction was ready to be closed. But when Sellers executed the Decker DROA on December 2, 1977, rather than closing the transaction with Buyers, Sellers breached the Burgess DROA.

---

[7] Although Sellers contend that consent was unnecessary since title would not pass to Buyers at the time scheduled for closing, Sellers expressly agreed in the escrow instruction that they would be handing to American Escrow the agreement of sale and consent.

[8] An agreement to modify a land sales contract "may be inferred from the attendant circumstances and conduct of the parties." 77 Am. Jur. 2d *Vendor and Purchaser* § 534 at 663 (1975). Anderson testified that even after the expiration of the scheduled closing date of January 20, 1977, "we wanted to sell the property and we were willing to assist and help overcome any obstacles that might be out there in Mr. Burgess's way." 6/29/82 Transcript at 162.

Sellers also contend that since the Burgess DROA did not provide for expenses and other contingencies, such as lease rents, property taxes, and other costs, arising after January 20, 1977, Buyers' claim is barred by the Statute of Frauds, Hawaii Revised Statutes § 656-1. This contention is without merit. To satisfy the requirements of the Statute, the writing need merely state "with reasonable certainty the essential terms of the unperformed promises in the contract." Restatement (Second) of Contracts § 131 (1981). *See also Boteilho v. Boteilho,* 58 Haw. 40, 564 P.2d 144 (1977); *Francone v. McClay,* 41 Haw. 72 (1955). The writing need not cover every possible contingency or eventuality. *See In re Sing Chong Co., Ltd.,* 1 Haw. App. 236, 617 P.2d 578 (1980).

The Burgess DROA clearly met the requirements of the Statute of Frauds. Moreover, it expressly provided that property taxes and lease rents would be prorated as of the date of recordation of the conveyance documents.

We affirm the trial court's conclusion that Sellers breached the Burgess DROA on December 2, 1977 and are answerable in damages.[9]

## II. DAMAGES

The trial court awarded Buyers damages of $61,800 — the difference between the Burgess DROA contract price of $74,200 and Decker DROA contract price of $136,000. Sellers object, claiming Buyers are entitled to nominal damages only. We disagree.

The rule in this jurisdiction is that "when one sustains loss by breach of a contract, he is entitled to have just compensation commensurate with his loss." *Ferreira v. Honolulu Star-Bulletin, Ltd.,* 44 Haw. 567, 573-74, 356 P.2d 651, 655 (1960). However, such "loss must be shown with reasonable certainty and that excludes any

---

[9] We find no significance in this case that the breach was of a Deposit Receipt, Offer and Acceptance rather than an agreement of sale. *Cf. Kaiman Realty, Inc. v. Carmichael,* 66 Haw. 103, 659 P.2d 63 (1983).

showing or conclusion founded upon mere speculation or guess."
*Id.* at 576, 356 P.2d at 656. *See also Uyemura v. Wick,* 57 Haw. 102,
551 P.2d 171 (1976).

There is a split of authority among the states as to the measure
of the buyer's loss or damages where the seller breaches a land sales
contract and fails or refuses to convey. *Large v. Gregory,* 417 N.E.2d
1160 (Ind. App. 1981), sets forth the two applicable rules as fol-
lows:

> In jurisdictions following the "American" rule, the buyer is enti-
> tled to recover ordinary contract damages, measured by the
> difference between the contract price and the market value of
> the land, together with any part payments of the price. *See*
> *generally* 5 A. Corbin, Corbin on Contracts § 1098 (1964); C.
> McCormick, Handbook on the Law of Damages § 177 (1935).
> Jurisdictions accepting the "English" rule generally limit the
> buyer's recovery to his down payment plus interest and reason-
> able expenses incurred in investigating the title; only if the sel-
> ler has acted in bad faith or has assumed the risk of a failure to
> secure title will he be liable for ordinary contract damages.
> McCormick, *supra,* §§ 178-79. *See also* Corbin, *supra,* § 1098.

*Id.* at 1163-64. *See also* 8A G. Thompson, *Commentaries on the Modern
Law of Real Property* § 4478 (J. Grimes repl. 1963); 77 Am. Jur. 2d
*Vendor and Purchaser* §§ 519, 522-23 (1975).

Under the American rule the market value usually is deter-
mined at the time of breach, *see, e.g., Smith v. Warr,* 564 P.2d 771
(Utah 1977), although the "time of breach" is sometimes deemed to
be when "the conveyance was to be made." *Bachewicz v. American
National Bank & Trust Co.,* 126 Ill. App. 3d 298, 308, 466 N.E.2d
1096, 1106 (1984). The measure of the loss or damages under the
American rule is denominated "loss of the bargain" damages,
Annot., 11 A.L.R.3d 719, 721 (1967), or "benefit-of-the-bargain
damages." *Smith v. Warr, supra,* 564 P.2d at 772.

Based on an assumption that Hawaii is an English rule jurisdic-
tion, Sellers argue that Buyers are not entitled to loss of bargain
damages because the trial court failed to find "any fraud, malice or
ill-will" on Sellers' part. Our research indicates that Hawaii has not
specifically decided whether it is an American rule or English rule

state.[10] We now adopt the American rule.[11]

We consider the American rule to be more equitable than the English rule, especially with the inflationary trend in real estate values. *See* 5 Corbin on Contracts § 1098 (1964). Under the English rule the seller "is strongly tempted to avoid his agreement where there has been a rise in the value of the property." 77 Am. Jur. 2d *Vendor and Purchaser* § 523 at 652 (1975). Moreover, there is difficulty in ascertaining whether a seller "is actuated by good [or bad] faith in his refusal to convey." *Id.*

---

[10] *Uyemura v. Wick,* 57 Haw. 102, 551 P.2d 171 (1976), mentions in footnote 3 the case of *Charles County Broadcasting Co., Inc. v. Meares,* 270 Md. 321, 311 A.2d 27 (1973), which holds that Maryland is an English rule state. However, we do not consider this an adoption of the English rule in Hawaii.

Although the case of *Island-Gentry Joint Venture v. State,* 57 Haw. 259, 554 P.2d 761 (1976), applied a loss of the bargain remedy to a breaching buyer, that does not automatically compel us to apply the same rule to a breaching seller. A split English/American rule exists for a breaching seller, but no such division exists for a breaching buyer. 3 *American Law of Property* at 168-172 (1952). The general measure of damages for a breaching buyer is the difference between the contract price and the market value. M.R. Friedman, *Contracts and Conveyances of Real Property* 914 (4th ed. 1984). Thus the buyer's test is not an indicator of the seller's test. *Compare Greer v. Kooiker,* 312 Minn. 499, 253 N.W.2d 133 (1977) (American rule applied to breaching seller) and *Frank v. Jansen,* 303 Minn. 86, 226 N.W.2d 739 (1975) (damages for breaching buyer is difference between contract and market values) *with Charles County Broadcasting Co., Inc. v. Meares, supra* (English rule applied to breaching seller) and *Kasten Construction Co. v. Jolles,* 262 Md. 527, 278 A.2d 48 (1971) (damages for breaching buyer is difference between contract and market values). Hawaii must still choose which rule to apply to a seller's breach.

[11] The American rule jurisdictions include the following: District of Columbia, *Cohen v. Lovitz,* 255 F. Supp. 302 (1966), *aff'd sub nom. Wolf v. Cohen,* 379 F.2d 477 (D.C. Cir. 1967); Georgia, *Hood v. Hallman,* 143 Ga. App. 507, 239 S.E.2d 194 (1977); Illinois, *Bachewicz v. American National Bank & Trust Co.,* 126 Ill. App. 3d 298, 466 N.E.2d 1096 (1984); Maine, *Forbes v. Wells Beach Casino, Inc.,* 409 A.2d 646 (Me. 1979); Minnesota, *Greer v. Kooiker, supra;* Mississippi, *Tansil v. Horlock,* 204 So.2d 457 (Miss. 1967); Nebraska, *Oman v. City of Wayne,* 152 Neb. 341, 40 N.W.2d 916 (1950); New Mexico, *Aboud v. Adamas,* 84 N.M. 683, 507 P.2d 430 (1973); Utah, *Smith v. Warr,* 564 P.2d 771 (Utah 1977); and Wyoming, *Reed v. Wadsworth,* 553 P.2d 1024 (Wyo. 1976).

Two states have adopted the American rule by statute: California, Cal. Civ. Code § 3306, as amended by § 262, 1983 Cal. Stat., and North Dakota, N.D. Cent. Code § 32-03-13 (1976). Interestingly, California followed the English rule for over fifty years, until it abruptly dropped the bad faith requirement in 1983.

Section 2-510 of the Uniform Land Transaction Act adopts the American rule except in situations where "a seller is unable to convey because of a title defect of which the seller had no knowledge at the time of entering into the contract[.]" 13 Uniform Laws Annotated 638 (Master ed. 1980).

In part I, *supra,* we held that Sellers breached the Burgess DROA on December 2, 1977. The trial court found that "[t]he purchase price of $136,000.00 [under the Decker DROA] was the fair market value of the real property on December 2, 1977." Finding of Fact 31. That finding was not challenged by Sellers and is binding on them. *Wisdom v. Pflueger,* 4 Haw. App. 455, 667 P.2d 844 (1983). The difference between $136,000 (fair market value at the time of breach) and $74,200 (contract price), or $61,800 (benefit-of-the-bargain damages), was awardable to Buyers despite no finding of "fraud, malice or ill-will" on Sellers' part by the trial court. Buyers' loss of bargain was shown with "reasonable certainty."

### III. ATTORNEY'S FEES

Pursuant to Hawaii Revised Statutes (HRS) § 607-17 (1976),[12] the trial court awarded Buyers attorney's fees of $15,676.93, being 25% of the damages awarded plus costs. Sellers contend that the trial court erred since Buyers' claim was not based on a contract in writing providing for attorney's fees. We agree.

Although the Burgess DROA contains no provision for attorney's fees, the A/S provides for such fees. Consequently, the trial court must have awarded attorney's fees under HRS § 607-17 on the grounds that Buyer's claim was based on the A/S.[13]

We cannot conclude, however, that Buyers' action was based on the A/S when their theory was that the A/S was unenforceable by Sellers without S & E's and Bishop Estate's consent. If the A/S was binding without their consent, it should have been recorded by American Escrow and Buyers would then have been obligated to occupy Lot 1576 and commence the required construction on the lot.

---

[12] Attorney's fees are awardable under HRS § 607-17 where an action is on "a promissory note or other contract in writing which provides for an attorney's fee[.]"

[13] In its Finding of Fact 12, which was challenged by Sellers, the trial court found that the A/S "constitutes a binding contract" between Sellers and Buyers.

Buyers' action was really based on the Burgess DROA, which did not provide for attorney's fees. Thus, the trial court should have awarded attorney's fees pursuant to HRS § 607-14 (1976).[14]

The maximum attorney's fees awardable to Buyers under HRS § 607-14 on the judgment exclusive of costs total $2,170. We therefore modify the judgment by reducing the attorney's fees of $15,676.93 to $2,170.

## IV. THIRD-PARTY COMPLAINT

In their third-party complaint Sellers sought contribution or indemnity from Hasegawa personally on the theories that (1) he acted improperly in withholding S & E's consent to the A/S and (2) he tortiously interfered with the contractual relations between Sellers and Buyers.[15] Sellers claim that the trial court erred in dismissing the third-party complaint. We disagree.

### A. *Withholding of Consent*

Sellers contend that the trial court erroneously concluded that Hasegawa's withholding of S & E's consent, whether reasonable or unreasonable, was done within the scope of his authority as an S & E officer and, consequently, he was not personally liable. Sellers' contention is meritless.

---

[14] HRS § 607-14 provides in relevant part:

In all the courts, in all actions in the nature of assumpsit there shall be taxed as attorneys' fees, in addition to the attorneys' fees otherwise taxable by law, to be paid by the losing party . . . a fee which the court determines to be reasonable but which shall not exceed the amount obtainable under the following schedule:

- 25   per cent on the first $1,000 or fraction thereof.
- 20   per cent on the second $1,000 or fraction thereof.
- 15   per cent on the third $1,000 or fraction thereof.
- 10   per cent on the fourth $1,000 or fraction thereof.
- 5   per cent on the fifth $1,000 or fraction thereof.
- 2.5 per cent on any amount in excess of $5,000.

The above fees shall be assessed on the amount of the judgment exclusive of costs and all attorney's [sic] fees obtained by the plaintiff, and upon the amount sued for if the defendant obtains judgment.

[15] Sellers could not name S & E as third-party defendants because Sellers executed a Guaranty and Indemnity Agreement dated February 17, 1978, with S & E and Bishop Estate. Hasegawa's Exhibit E.

To prevail on their contention, Sellers needed to prove that Hasegawa acted outside the scope of his authority. Sellers challenged three of the conclusions of law without attacking any of the findings of fact. But the trial court found that Hasegawa was an officer of S & E (Finding 4), that S & E took no action to repudiate or disclaim any of Hasegawa's actions "as not being within the scope of his authority as an officer and director of S & E" (Finding 23), and that S & E's board of directors ratified Hasegawa's actions regarding the withholding of S & E's consent (Finding 24). Those unchallenged findings supported the challenged conclusions. Unchallenged findings of fact are binding upon the appellant. *Wisdom v. Pflueger, supra.*

Conclusions of law which are supported by the trial court's findings of fact and which apply the correct rules of law will not be reversed on appeal. *SGM Partnership v. Nelson,* 5 Haw. App. 526, 705 P.2d 49 (1985); *Nani Koolau Co. v. K & M Construction, Inc.,* 5 Haw. App. 137, 681 P.2d 580 (1984). Under principles of both corporation and agency law, Hasegawa cannot be held personally liable for the contractual actions of S & E. *Kahn v. Weldin,* 60 Or. App. 365, 653 P.2d 1268 (1982); 1 G. Hornstein, *Corporation Law and Practice* § 518 (1959). The challenged conclusions correctly applied the rule of law and are not erroneous.

### B. *Tortious Interference with Contractual Relations*

Sellers assert that the trial court erred in failing to make any findings regarding Sellers' third-party claim based on Hasegawa's alleged tortious interference with the contractual relations between Sellers and Buyers.[16] The assertion is true but the error was harmless.

The trial court's lack of findings of fact on this issue would normally require our remanding the case for such findings. However, where it is plain to the appellate court that the record clearly

---

[16] Our reading of the third-party complaint indicates that Sellers failed to properly plead their alleged claim against Hasegawa for tortious interference with contractual relations. However, Hasegawa elected to treat the claim as properly pled and thus waived his objection to the alleged claim. *See* 61 Am. Jur. 2d *Pleading* §§ 388-89, 391 (1972).

reflects what the finding must be, the court may elect to decide the appeal without further findings. *See Joaquin v. Joaquin,* 5 Haw. App. 435, 698 P.2d 298 (1985); 9 C. Wright & A. Miller, Federal Practice and Procedure: *Civil* § 2577 (1971).

Where corporate officers or directors participate in tortious conduct, such as a tortious interference with contractual relations, they are not shielded by the corporation and will be personally liable. *Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 543 P.2d 1356 (1975).

The elements of tortious interference with contractual relations are (1) a contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach the contract, (4) absence of justification on the defendant's part, (5) the subsequent breach of the contract by the third party, and (6) damages to the plaintiff. *See* 3 J. Dooley, *Modern Tort Law-Liability & Litigation* § 44.02 (B. Lindahl rev. 1984); *Bendix Corp. v. Adams,* 610 P.2d 24 (Alaska 1980).

To prevail in their tort claim, Sellers had to prove that Hasegawa intentionally induced the breach of the contract involved. *See Chow v. Alston,* 2 Haw. App. 480, 634 P.2d 430 (1981). We find no evidence in the record of intentional inducement on the part of Hasegawa.[17] We find instead an officer asserting his corporation's contractual right to withhold the corporation's consent to the sale and transfer of the leasehold, and we cannot find tortious interference where a corporation is legally permitted to exercise such right. Thus, the trial court's failure to make findings on this issue was harmless error, for if it had found differently, the lack of evidence in the record on an essential element would have made such finding clearly erroneous and reversible by this court. *See Joaquin v. Joaquin, supra.*

The trial court did not err in dismissing Sellers' third-party complaint.

---

[17] We are aware of Hasegawa's statement, "Screw Anderson/Arita/ they piss me off." We do not conclude, however, that this alone evidences intent to induce breach; rather this seems to be understandable anger at Sellers for their continued failure to construct the required building on the leased lot.

## V. CONCLUSION

In its answering brief, Buyers contend that Sellers' appeal is frivolous. Sellers having succeeded in reducing the attorney's fees awarded to Buyers, the appeal cannot be deemed frivolous.

Except as to the amount of attorney's fees awarded, we affirm the judgment in all particulars. We modify the judgment by reducing the attorney's fees to $2,170.

Affirmed as modified.

*Steven K.S. Chung (Walter G. Chuck* with him on the briefs; *Walter G. Chuck,* Attorney at Law, A Law Corporation, of counsel) for defendants and third-party plaintiffs-appellants.

*Howard C. Glickstein (David C. Schutter* with him on the brief; *Schutter Cayetano Playdon Pavey,* of counsel) for plaintiffs-appellees.

*Mark R. Thomason (Matthew S.K. Pyun, Jr.* with him on the brief; *Pyun, Okimoto & Thomason,* of counsel) for third-party defendant-appellee.