Kevin RAINS
and Mitzi Rains,
*Plaintiffs-Respondents,*

*v.*

STAYTON BUILDERS MART, INC.;
John Doe Lumber Supplier;
John Doe Lumber Mill;
and Five Star Construction, Inc.,
*Defendants.*

STAYTON BUILDERS MART, INC.,
*Third-Party Plaintiff-Respondent,*

*v.*

RSG FOREST PRODUCTS, INC.,
et al.,
*Third-Party Defendants,*

*and*

WEYERHAEUSER COMPANY,
*Third-Party Defendant-Appellant.*

WEYERHAEUSER COMPANY,
*Fourth-Party Plaintiff,*

*v.*

RODRIGUEZ & RAINS CONSTRUCTION,
an Oregon corporation,
*Fourth-Party Defendant.*

WITHERS LUMBER COMPANY,
*Fourth-Party Plaintiff,*

*v.*

SELLWOOD LUMBER CO., INC.,
an Oregon corporation;
and Weyerhaeuser Company,
*Fourth-Party Defendants.*

WESTERN INTERNATIONAL FOREST
PRODUCTS, INC.,
*Fourth-Party Plaintiff,*

*v.*

Benito RODRIGUEZ,
Kevin Rains, and
Rodriguez & Rains Construction,
*Fourth-Party Defendants.*

SELLWOOD LUMBER CO., INC.,
an Oregon corporation,
*Fifth-Party Plaintiff,*

*v.*

SWANSON BROS. LUMBER CO., INC.,
an Oregon corporation,
*Fifth-Party Defendant.*

Marion County Circuit Court
06C21040; A145916

336 P3d 483

Michael T. Stone argued the cause and filed the briefs for appellant.

Maureen Leonard argued the cause for respondents Kevin and Mitzi Rains. With her on the brief were Brian Whitehead and J. Randolph Pickett.

Thomas W. Brown argued the cause for respondent Stayton Builders Mart, Inc. With him on the brief were Nicholas E. Wheeler, Julie A. Smith, and Cosgrave Vergeer Kester LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Plaintiffs Kevin and Mitzi Rains filed an action against several parties seeking damages for injuries sustained by Kevin when a board on which he was standing broke, causing him to fall 16 feet to the ground. Kevin, who was working as a subcontractor on a construction project, sustained a thoracic T12 vertebrae burst fracture that resulted in paraplegia. Kevin brought claims against a number of parties for negligence and strict products liability. Mitzi also brought a claim for loss of consortium. Eventually, after several rounds of third-party practice and a partial settlement agreement between plaintiffs and Stayton Builders Mart (the company that supplied the board to the job site), the case proceeded to trial on Kevin's strict products liability claim and Mitzi's loss of consortium claim against Stayton, and claims against Weyerhaeuser Company (the third-party defendant that had provided lumber to Stayton). The jury returned a verdict for plaintiffs, and the trial court determined that Stayton was entitled to indemnity from Weyerhaeuser. The trial court also awarded Stayton its defense costs from Weyerhaeuser. Weyerhaeuser appeals the judgments that resulted from the litigation.

## I. BACKGROUND

The relevant background facts are undisputed and mostly procedural. Kevin originally brought his action for negligence and strict products liability against Five Star Construction, Inc.[1] (the general contractor), Stayton, and the John Doe company that sold the defective board to Stayton. Mitzi filed a claim for loss of consortium against those same parties. Sometime later, Stayton filed a third-party complaint against Weyerhaeuser for common-law indemnity and contribution, alleging that Weyerhaeuser had provided the defective board to Stayton.[2] Shortly before trial, plaintiffs

---

[1] Plaintiffs also brought a claim against Five Star under ORS 654.305 (the "Employer Liability Law"). Plaintiffs obtained a default judgment against Five Star, and Five Star is not a party to this appeal.

[2] Stayton also named several other lumber companies in its third-party complaint. Several of those parties filed what they labeled "fourth-party" complaints, and the defendant to one of those actions filed a "fifth-party complaint." Other than Weyerhaeuser, all of the third-, fourth-, and fifth-party defendants were eventually dismissed from the action, and they are not parties to this appeal.

entered into a partial settlement agreement with Stayton that dismissed plaintiffs' negligence claims against Stayton and limited Stayton's financial exposure on the strict products liability claim, but left Stayton in the litigation as a defendant.

The case proceeded to trial and the jury returned a verdict against Stayton and Weyerhaeuser. In addition, the jury applied the comparative fault statute, ORS 31.600(2), and designated Stayton 30 percent at fault, Weyerhaeuser 45 percent at fault, and Kevin 25 percent at fault. The jury awarded Kevin $5,237,700 in economic damages and $3,125,000 in noneconomic damages, and Mitzi $1,012,500 in noneconomic damages. After reducing the judgment to account for Kevin's comparative fault, the trial court entered a limited judgment for plaintiffs in the sum of $7,031,400.

In a subsequent hearing, the trial court ruled in favor of Stayton on its indemnity claim and entered a limited judgment for Stayton against Weyerhaeuser for $2,000,000. Later, the court entered a general judgment against Weyerhaeuser awarding Stayton its defense costs in the amount of $265,458.70. Weyerhaeuser appeals the limited judgments and the general judgment.

On appeal, Weyerhaeuser raises 13 assignments of error. We reject three assignments—numbered eight, nine, and eleven—without discussion. The first four assignments relate to the partial settlement agreement between plaintiffs and Stayton. For the reasons explained below, we reject Weyerhaeuser's first and second assignments of error, and conclude that its third and fourth assignments were not preserved. Weyerhaeuser's fifth and sixth assignments challenge the verdict form used at trial. We conclude that the fifth assignment was not preserved, and reject the sixth assignment on the merits. Weyerhaeuser's seventh assignment contends that the trial court should have reduced each plaintiff's noneconomic damages award to $500,000 under ORS 31.710. We agree that the trial court should have applied the statutory cap to Kevin's strict products liability claim, and reverse plaintiffs' limited judgment for correction of that error. However, we conclude that the trial court correctly determined that the cap, as applied to Mitzi's loss

of consortium claim, would violate Article I, section 17, of the Oregon Constitution, and affirm the judgment on that issue. In its tenth assignment, Weyerhaeuser contends that the court erroneously entered a judgment for Stayton on its indemnity claim because Stayton failed to prove that it had discharged Weyerhaeuser's liability to plaintiffs. We agree, and reverse Stayton's limited judgment. Finally, in its twelfth and thirteenth assignments of error, Weyerhaeuser contends that the trial court erred by awarding Stayton its defense expenses. Stayton concedes that $1,512 of appeal-related fees should not have been awarded by the trial court. We accept that concession, and reverse the general judgment for correction of that error, but otherwise reject Weyerhaeuser's twelfth and thirteenth assignments of error.

## II. ANALYSIS

We divide our discussion of Weyerhaeuser's assignments of error into five groups and discuss any additional relevant facts as necessary within each group. First, we address assignments one through four, which involve the partial settlement between plaintiffs and Stayton. Second, we address assignments five and six, which challenge the verdict form used by the court. Third, we address assignment seven relating to the $500,000 cap on noneconomic damages. Fourth, we address Weyerhaeuser's tenth assignment, which relates to the validity of the limited judgment on Stayton's indemnity claim. And finally, we address the twelfth and thirteenth assignments involving the trial court's award of defense costs to Stayton.[3]

A. *The agreement: first through fourth assignments of error*

Weyerhaeuser's first through fourth assignments relate to the partial settlement agreement between Stayton and plaintiffs. We begin with the relevant text of that

---

[3] Weyerhaeuser requests *de novo* review of its tenth through thirteenth assignments of error. Stayton disputes that common-law indemnity—the claim that is at issue in those assignments of error—is an equitable proceeding, such that we would have discretion to exercise *de novo* review. *See* ORS 19.415(3) (granting discretion to review certain equitable proceedings *de novo*). We need not resolve the parties' disagreement on that issue because, even assuming that we have discretion to exercise *de novo* review as to those assignments, we do not find this an "exceptional" case requiring such review. *See* ORAP 5.40(8)(c).

agreement.[4] The agreement provided that if the parties did not mutually resolve their claims against Weyerhaeuser and proceeded to trial:

"1. In the event of a verdict, net of plaintiffs' comparative fault, in favor of plaintiffs against Stayton Builders Mart in an amount less than $1.5 million, or in the event of a defense verdict, Stayton Builders Mart will pay plaintiffs the sum of $1.5 million. Stayton Builders Mart will be free to collect any amount it is awarded in its contribution or indemnity claims from third-party defendant.

"2. In the event of a net verdict in excess of $1.5 million, Stayton Builders Mart will pay the amount of the verdict up to $2 million. Any excess over $2 million that is recovered by Stayton Builders Mart on its indemnity or contribution claims against third-party defendant Weyerhaeuser, if any, shall be paid to the plaintiffs.

"3. In exchange for the defendant entering into this High-Low Agreement, the plaintiffs agree to dismiss their negligence claims against Stayton Builders Mart, Inc.

"4. Both plaintiffs and Stayton Builders Mart agree not to appeal the jury verdict on plaintiffs' claim against Stayton Builders Mart. Stayton Builders Mart retains the right to appeal the jury verdict on its third-party indemnity and contribution claims.

"5. Stayton Builders Mart agrees to pursue its indemnity claim based upon strict liability against third-party defendant through trial to verdict.

"6. In the event of an appeal by third-party defendant that could affect Stayton Builders Mart's obligations under this Agreement, Stayton Builders Mart and its insurer will pay the sum of $1.5 million within 60 days after the jury verdict. The potential obligation of Stayton Builders Mart and its insurer for the remaining $500,000 will then be determined by the ultimate outcome of the appeals process, pursuant to the terms of this Agreement."

---

[4] Weyerhaeuser, as part of its second assignment of error, argues that plaintiffs and Stayton failed to disclose all terms of the agreement, in violation of ORS 31.815(2)'s requirement that, when a covenant not to sue is given, the claimant shall give notice of all terms of the covenant to all persons against whom the claimant makes claims. We reject Weyerhaeuser's contention that it was not informed of all terms of the agreement, and thus, for purposes of this appeal, accept the written terms of the agreement as the entire agreement.

As a preliminary matter, the parties dispute whether the agreement should be labeled a "Mary Carter agreement"[5] or a "high-low agreement."[6] As its terms demonstrate, the agreement has aspects consistent with each label. In the end, however, the precise label is not material in this case; it is the substance of the agreement that drives our analysis. Accordingly, we simply refer to it as "the agreement."[7]

After Stayton and plaintiffs entered into the agreement, Weyerhaeuser moved to dismiss Stayton from the action as a defendant, arguing that there was no longer a justiciable controversy between plaintiffs and Stayton because the agreement eliminated any adversity between them. The trial court's denial of that motion is the subject of Weyerhaeuser's first assignment of error.

As relevant to the parties' arguments, whether a justiciable controversy exists depends on whether (1) "the interests of the parties to the action are adverse" and (2) "the court's decision in the matter will have some practical effect on the rights of the parties to the controversy." *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993).

Weyerhaeuser argues, as it did to the trial court, that the agreement eliminated all adversity between plaintiffs and Stayton. Specifically, Weyerhaeuser contends that, under the terms of the agreement, Stayton's only chance of recovering the money that it agreed to pay plaintiffs

---

[5] In *Grillo v. Burke's Paint Co.*, 275 Or 421, 425 n 1, 551 P2d 449 (1976), the Supreme Court noted that the term "Mary Carter agreement" arose from the case of *Booth v. Mary Carter Paint Co.*, 202 So 2d 8 (Fla 1967), and

"now appears to be used rather generally to apply to any agreement between the plaintiff and some (but less than all) defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the non-agreeing defendant or defendants."

[6] A high-low agreement, according to *Black's Law Dictionary* 797 (9th ed 2009), is "[a] settlement in which a defendant agrees to pay the plaintiff a minimum recovery in return for the plaintiff's agreement to accept a maximum amount regardless of the outcome of the trial."

[7] At times in this opinion, we use the labels that the parties have given the agreement. Our use of those labels is merely for ease of reference to the parties' arguments or the authority relied upon by the parties and should not be taken as something more.

was if (1) the jury found Stayton and Weyerhaeuser liable for at least $1.5 million and (2) Stayton successfully recovered in indemnity from Weyerhaeuser. Stated simply, Weyerhaeuser contends that "Stayton's sole interest was in the jury finding both Weyerhaeuser and it to be liable, which would position it to recover all its damages in indemnity from Weyerhaeuser." Weyerhaeuser further complains that any attempt by Stayton to "defend itself at trial would only have increased Stayton's liability and decreased its opportunity to avoid all damages, as such efforts could have benefited Weyerhaeuser." Accordingly, Weyerhaeuser complains that the interests of plaintiffs and Stayton were "fully aligned" at trial, which should have led to the dismissal of Stayton.

Plaintiffs counter that the agreement was only a partial settlement and that it did not extinguish all adversity between plaintiffs and Stayton. In particular, plaintiffs point out that the agreement established a potential range of liability for Stayton between $1.5 and $2 million, which they argue made their interests adverse enough to survive Weyerhaeuser's challenge to justiciability. The trial court agreed with plaintiffs on this point, and so do we.

At the outset, we acknowledge that agreements such as the one at issue here have the potential to distort the adversarial process. The Supreme Court, in *Grillo v. Burke's Paint Co.*, 275 Or 421, 426, 551 P2d 449 (1976), recognized that "Mary Carter agreements have been criticized as distorting the relationship between plaintiffs and defendants, resulting in a non-adversary and possibly collusive proceeding between the plaintiff and one defendant which may adversely affect the non-settling defendant's right to a fair trial."[8] *Cf. Elbaor v. Smith*, 845 SW2d 240

[8] In *Bocci v. Key Pharmaceuticals, Inc.*, 158 Or App 521, 974 P2d 758 (1999), *vac'd*, 332 Or 39, 22 P3d 758 (2001), this court had the occasion to debate the ill effects of Mary Carter agreements on the adversarial process. *Bocci*, however, was a case affirmed by an equally divided court, and thus, has no precedential value. *See Perez v. Bay Area Hospital*, 315 Or 474, 478 n 5, 846 P2d 405 (1993) (noting that affirmance by an equally divided court is not entitled to precedential weight). After pointing out the many potential ills of Mary Carter agreements, the dissent in *Bocci* concluded that the Mary Carter agreement in that case completely realigned the interests of the plaintiff and the settling defendant, such that "their alignment as plaintiff and defendant was completely illusory." 158 Or

(Tex 1992) (declaring Mary Carter agreements void in certain instances as "violative of sound public policy"); *see generally* John E. Benedict, *It's a Mistake to Tolerate the Mary Carter Agreement*, 87 Colum L Rev 368 (1987) (concluding that such agreements distort tort litigation by prejudicing nonsettling defendants at trial, undermining the equitable apportionment of damages among tortfeasors, and contravening legal ethics). Nevertheless, despite acknowledging the problems with such agreements, the Supreme Court joined the majority of jurisdictions and declined to declare such agreements void; instead, the court recognized that the problems could be addressed by instituting safeguards, such as disclosing the agreement to the parties, the court, and the factfinder, such that the factfinder could evaluate the agreement's effect on the adversarial process. *Grillo*, 275 Or at 426-27.

We also acknowledge that Stayton, as a result of the agreement, had an interest in the jury finding both it and Weyerhaeuser liable for at least $1.5 million. That is so because, if the jury had returned a defense verdict, Stayton would have been liable to plaintiffs for $1.5 million under the agreement and would have been precluded from recovering in indemnity because Weyerhaeuser would not have been found to be liable to plaintiffs. *See Marton v. Ater Construction Co., LLC*, 256 Or App 554, 560, 302 P3d 1198 (2013) (explaining that one of the elements of a common-law indemnity claim is that "the [indemnity-]defendant was also liable to the third party").

Nevertheless, the potential ills created by such agreements did not, as a matter of law, extinguish all adversity between plaintiffs and Stayton. Instead, whether adversity continued to exist depended on the terms of the agreement, as illustrated by two of our prior decisions.

In *Stephens v. Bohlman*, 138 Or App 381, 384-85, 909 P2d 208, *rev dismissed*, 324 Or 177 (1996), we explained that adversity is extinguished and a case is no longer

App at 556 (Landau, J., dissenting). The concurrence disagreed, noting that the Mary Carter agreement in that case limited the settling defendant's liability to between $200,000 and $1,000,000, and did not establish the settling defendant's liability. Thus, in the view of the concurrence, some adversity remained between the parties. *Id.* at 529 (Riggs, J., concurring).

justiciable when a party has "no interest" in the outcome of the case because it could "neither gain nor lose anything as a result of the trial." In that case, the plaintiff brought a medical malpractice action against a physician and a hospital. The plaintiff and the hospital entered into a settlement agreement whereby the hospital agreed to pay the plaintiff $90,000 and remain in the case as a defendant "as though they had not reached a settlement." *Id.* at 384. In return, the plaintiff agreed not to execute on any judgment against the hospital and released the hospital from any liability in excess of $90,000. *Id.* We concluded that that agreement had extinguished all adversity between the plaintiff and the hospital and that the trial court had erred in failing to dismiss the hospital before the trial began. *Id.* at 385-86. We explained that the hospital's payment of $90,000

> "was absolute; nothing in the agreement entitles it to recover any portion or to pay any additional amount no matter what the outcome of the lawsuit against defendant. Thus, [the] hospital's only purpose for appearing at the trial was to fulfill its contractual obligation to plaintiff because it had no interest in the outcome."

*Id.* at 384. Accordingly, we concluded that the hospital had nothing at stake in the outcome of the case, and the trial court erred in not dismissing the hospital as a party.[9] *Id.* at 385-86.

In *Dew v. City of Scappoose*, 208 Or App 121, 143, 145 P3d 198 (2006), *rev den*, 342 Or 416 (2007), we concluded that "[m]erely because a party is fully indemnified against potential liability, it does not follow that the party has nothing at stake in an action against it, nor does it render such an action moot." In that case, the plaintiff filed an action against the City of Scappoose and one of its city councilors relating to her termination from employment with the city. In particular, she brought two claims against the councilor, one under 42 USC section 1983 and the other for intentional economic interference. *Id.* at 126. Eventually, the plaintiff entered into a settlement agreement with the councilor in which the

---

[9] Ultimately, we determined that the error was not reversible error because it did not substantially prejudice the physician in the conduct of his case. *Stephens*, 138 Or App at 386-87.

plaintiff agreed to dismiss the intentional interference claim and not to enforce any judgment against him on the section 1983 claim in excess of his insurance policy limits, or in an amount not collectible directly from the city. The agreement also provided that it was not intended to release the councilor as a defendant in the lawsuit on the section 1983 claim, or hinder his ability to defend himself. *Id.* at 127-28, 143. The trial court dismissed the section 1983 claim on mootness grounds, concluding that the agreement left the councilor with no personal exposure, thus making the remaining claim against him no longer justiciable. *Id.* at 128.

We reversed, explaining that, even though the agreement effectively insulated the councilor from any personal financial exposure, "the question of his liability remains an open one." *Id.* at 143. Accordingly, we concluded that the outcome of the trial would have a practical effect on the councilor's rights "because it will determine whether he is personally liable. Because [his] personal liability to [the] plaintiff has yet to be determined, the parties remain in an adversarial relationship and the issue is not moot." *Id.* In reaching that conclusion, we noted that *Stephens* differed because the plaintiff in that case "specifically discharged the defendant hospital from any further liability beyond the $90,000 that the hospital had already paid." *Id.*

We acknowledge that this case differs from *Dew* because the agreement in that case did not give the councilor an affirmative incentive to facilitate a determination that both he and the city were liable for the plaintiff's section 1983 claim; here, the agreement provided such an incentive to Stayton. Nevertheless, we conclude that, although the agreement in this case may have realigned the parties' interests and strategy at trial, it did not foreclose all adversity between plaintiffs and Stayton. That is, we cannot say that Stayton had nothing at stake in the outcome of the case. Most importantly, the agreement did not absolutely establish Stayton's potential financial exposure. Instead, it set up a range of liability for Stayton that, at least on some level, maintained an adversarial position between the parties. The remaining adversity was that every dollar above $1.5 million that the jury awarded to plaintiff against Stayton,

up to a maximum of $2 million, equaled an additional dollar that Stayton had to pay to plaintiffs. The mere possibility that Stayton would later prevail on its indemnity claim and fully recover all of that additional money from Weyerhaeuser did not extinguish the adversity that remained at the time of trial. *See Dew*, 209 Or App at 143 (an agreement that effectively insulates a party from personally having to pay any judgment does not extinguish adversity). Accordingly, in the circumstances of this case, adversity remained between Stayton and plaintiffs.

Weyerhaeuser's second through fourth assignments of error challenge the trial court's denial of Weyerhaeuser's request to admit the agreement into evidence. At a pretrial hearing, Weyerhaeuser argued that the agreement should be admitted into evidence because

> "Weyerhaeuser would like to make use of the Mary Carter Agreement during the course of the presentment of evidence. We believe the jury has a right to know of this agreement. They have a right to know the terms of this agreement. They also have a right to know that it's insurance that's paying these terms as opposed to Stayton Builders Mart, a small, local lumber yard."

Weyerhaeuser then acknowledged that, under OEC 411,[10] evidence of liability insurance is not relevant to the issue of whether a person acted negligently or otherwise wrongfully, but proceeded to argue that

> "[t]he concern is that in typical cases where a defendant has insurance, a plaintiff would use that against the defendant and essentially show the jury, well, don't worry about this defendant, whether they can pay. They have got insurance. And that heightens the likelihood that a jury would find negligence. In this case, it's different.

---

[10] OEC 411 provides:

"(1) Except where lack of liability insurance is an element of an offense, evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully.

"(2) Subsection (1) of this section does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proving agency, ownership or control, or bias, prejudice or motive of a witness."

"In this case, the jury will be left with the impression that this small, local lumber yard is potentially on the hook for a very large settlement. And they might think differently as to how to deal with the apportionment of damages if they were under that false impression.

"The true impression is that the money is being paid by a very large insurance company in Ohio, and the jury has a right to know that. And it is not within the exclusion as detailed in [the] Oregon Rules of Evidence."

The trial court ruled that "[b]ased upon the ruling in *Bocci*, the court would be consistent with that ruling and say that the terms of the agreement and the fact that insurance is involved would not be admissible at trial."[11]

In its second assignment of error, Weyerhaeuser contends that the trial court erred by denying Weyerhaeuser's request to admit the agreement into evidence. Weyerhaeuser first argues that Mary Carter agreements are, as a matter of law, admissible into evidence upon the request of any nonsettling defendant. In particular, Weyerhaeuser relies on the Supreme Court's statement in *Grillo* that

"[h]aving reviewed [cases from other jurisdictions discussing the validity of Mary Carter agreements], we conclude that the [Mary Carter agreement] in the instant case is valid and enforceable, but that it would have been subject to pretrial discovery and, upon request of defendant, would have been admissible in evidence."

275 Or at 427. Weyerhaeuser maintains that the Supreme Court's holding in *Grillo* unambiguously requires Mary Carter agreements to be admitted into evidence at the request of the nonsettling defendant. In doing so, Weyerhaeuser argues that such agreements must be admitted without

---

[11] As we previously noted, *Bocci* has no precedential value to this case. 264 Or App at 644-45. The concurrence in *Bocci* concluded that the trial court did not err in denying admission of the Mary Carter agreement because the agreement contained liability insurance information, *see* OEC 411, and that, given the inadmissible material in the agreement and the defendant's failure to offer the agreement without the offending material, the trial court could exclude the agreement from evidence. 158 Or App at 536 (Riggs, J., concurring). The dissent would have allowed the agreement into evidence because of the Supreme Court's holding in *Grillo*, and thought it improper to resolve the issue on the basis of the insurance information because that issue had not been raised at trial. *Id.* at 560 (Landau, J., dissenting).

concern for whether admission of the agreement, or parts of it, would otherwise be precluded by the Oregon Evidence Code.

Plaintiffs counter that Weyerhaeuser offered the agreement to inform the jury that any financial obligation incurred by Stayton at trial would be paid by Stayton's insurer and that such a purpose—to demonstrate that Stayton had insurance coverage and to influence the jury's potential allocation of fault and its damage award—was impermissible under OEC 411. Plaintiffs acknowledge that "[t]he jury was entitled to know that plaintiffs and Stayton had entered into a partial settlement in which Stayton's liability would be based on the outcome of trial," but asserts that the jury was not entitled to know that Stayton's insurer would pay Stayton's obligation to plaintiffs.

Ultimately, we conclude that the trial court did not err. As an initial matter, we disagree that the court in *Grillo* explicitly held that all Mary Carter agreements must be admitted into evidence without any analysis of relevance and admissibility under the Oregon Evidence Code. The court did not have occasion to consider that question. Rather, the court reviewed the trial court's denial of a nonsettling defendant's motion for new trial based on the nonsettling defendant's post-trial determination that the plaintiff and the settling defendant had entered into a Mary Carter agreement immediately before trial. In reviewing that issue, the court examined the various criticisms of Mary Carter agreements and ultimately agreed with the jurisdictions that refuse to "condemn the agreements as invalid per se." 275 Or at 426. The court, in so concluding, simply noted that Mary Carter agreements are subject to pretrial discovery and are admissible upon request of the defendant. *Id.* at 427. Ultimately, the court resolved the case on the principle that a new trial was not justified because the evidence (of the Mary Carter agreement) could have been discovered before trial with the exercise of due diligence. *Id.* at 427-28. Given the way that the issue in *Grillo* was presented, discussed, and resolved, the statement that Mary Carter agreements are subject to discovery and admissible at trial is unremarkable, and we do not understand it to mean that all such agreements must be admitted in their entirety even if they contain material

that is deemed irrelevant or inadmissible under the Oregon Evidence Code.

Given that conclusion, it was appropriate for the trial court to evaluate Weyerhaeuser's request to admit the entire agreement between plaintiffs and Stayton in light of relevant provisions of the evidence code. *See* OEC 101(2) (the Oregon Evidence Code generally applies in civil actions). Weyerhaeuser makes a limited attempt to argue that "insurance was not being offered to show negligence or wrongful conduct, but to show prejudice and that small local lumber yard Stayton would not be on the hook to pay a judgment on their own." For two reasons, we agree with plaintiffs that the trial court did not err in excluding the agreement on the basis that it contained evidence of insurance in violation of OEC 411.

First, Weyerhaeuser's argument at the pretrial hearing was that the agreement should be admitted into evidence despite OEC 411 for the purpose of demonstrating that Stayton had insurance and would not be "on the hook for a very large settlement." As the Conference Committee Commentary to the Oregon Evidence Code states, OEC 411 exists because "[t]he inference of fault from the fact of insurance coverage is at best tenuous, and its converse equally so. More important, no doubt, is the feeling that knowledge of the presence or absence of insurance may induce juries to decide cases on improper grounds." Laird C. Kirkpatrick, *Oregon Evidence* § 411.02 (6th ed 2013). Weyerhaeuser offered the evidence of insurance for an improper purpose—to induce the jury to use the existence of insurance to influence its allocation of fault and damages. The trial court did not err by excluding the agreement on the basis that such an offer was improper under OEC 411.

Second, Weyerhaeuser concedes that it did not attempt to introduce the agreement with the insurance information redacted. Where a party attacks the exclusion of an exhibit that contains some irrelevant material, that party has "the burden of excising the irrelevant portions of the exhibit to preserve the claimed error." *Fazzolari v. Portland School Dist. No. 1J*, 78 Or App 608, 614, 717 P2d

1210 (1986), *aff'd on other grounds*, 303 Or 1, 734 P2d 1326 (1987). Accordingly, the court's decision to exclude the entire agreement, as offered, was not error.

We next consider Weyerhaeuser's third and fourth assignments of error. In its third assignment, Weyerhaeuser contends that, if the trial court properly concluded that the agreement could not be entered into evidence because of the insurance references, the trial court should have, at the very least, informed the jury about the other terms of the agreement so that the jury had a full understanding of it. In its fourth assignment of error, Weyerhaeuser argues that it should have been allowed to use the agreement, or evidence of its terms, to establish bias, interest, or motive of witnesses at trial. In particular, Weyerhaeuser asserts that the court should have allowed it to use the agreement in its cross-examination of Roberts, a key witness for Stayton whose testimony supported a finding that the broken board came from Weyerhaeuser.

Plaintiffs insist that Weyerhaeuser failed to preserve its third and fourth assignments of error. As to the third, plaintiffs point out that Weyerhaeuser never offered the agreement into evidence without the offending insurance references—as Weyerhaeuser does not dispute—and that, in fact, the court instructed the jury that the agreement existed and that the jury could consider it to evaluate the credibility or believability of witnesses who testified. As to the fourth assignment, plaintiffs maintain that it was not preserved because Weyerhaeuser never attempted to cross-examine Roberts about the agreement—and indeed, Weyerhaeuser concedes that it never attempted to raise the agreement during cross-examination of Roberts or any other witness.

Nevertheless, Weyerhaeuser takes the view that its third and fourth assignments of error are preserved because it was clear from the trial court's ruling at the pretrial hearing that neither the agreement nor its terms were admissible "for any purpose." As such, Weyerhaeuser relies on the principle that "when the trial court excludes an entire class of evidence by declaring, in advance, that it is inadmissible

as a matter of law, the ruling renders a further offer futile."
*State v. Olmstead*, 310 Or 455, 461, 800 P2d 277 (1990).

We reject Weyerhaeuser's argument that that principle applies in this instance. Rather, the record, particularly when considered in light of the purposes of the preservation rules, supports the conclusion that Weyerhaeuser had to raise the specific points that it now makes in its third and fourth assignments of error in order to preserve them for our review.

One purpose of the preservation rules is to allow the adversary to present its position and to permit the court to understand and avoid or correct the error. *Peiffer v. Hoyt*, 339 Or 649, 656-57, 125 P3d 734 (2005). Similarly, a focus of the preservation requirement "is whether a party has given opponents and the trial court enough information to be able to understand the contention and to fairly respond to it." *State v. Walker*, 350 Or 540, 552, 258 P3d 1228 (2011).

Neither of those purposes was served as to Weyerhaeuser's third and fourth assignments of error. At the pretrial hearing, Weyerhaeuser argued that the agreement as a whole should be entered into evidence, including the insurance references, for the express purpose of informing the jury that the money Stayton had agreed to pay to plaintiffs would be paid by a "very large insurance company in Ohio." Although Weyerhaeuser also made general reference to OEC 411 and the admission of insurance information for purposes of showing prejudice, that reference, considered in context, did not reasonably put plaintiffs, Stayton, or the trial court on notice that Weyerhaeuser was alternatively asking the court to inform the jury about the terms of the agreement in the way that it now argues it was precluded from doing at trial. The same goes for Weyerhaeuser's contention regarding cross-examination. Nothing at the pretrial hearing would have informed the court or other parties that Weyerhaeuser was requesting a ruling on whether it could use terms of the agreement, or the existence of the agreement, to cross-examine witnesses. Instead, Weyerhaeuser's argument at the pretrial hearing can be fairly characterized

only as a request to enter the entire agreement into evidence to inform the jury of its existence and to inform the jury that Stayton had liability insurance.

Furthermore, the trial court's charge to the jury both before and after the presentation of evidence undermines Weyerhaeuser's contention that the trial court's pretrial ruling unequivocally excluded any use of the agreement or its terms during trial. Prior to opening statements, the trial court informed the jury that Stayton and plaintiffs had entered into a settlement agreement, but Stayton remained a party to the action, and that the jury "may only consider the fact of the settlement as it might bear on the issues of credibility or believability of the witnesses who testify." The trial court similarly instructed the jury before it began its deliberations.[12]

In these circumstances, it was incumbent on Weyerhaeuser to seek to use the agreement or certain terms to establish bias, interest, or motive beyond its general request that the agreement be entered into evidence as a whole to show that Stayton was adequately insured. The third and fourth assignments of error are unpreserved.

B. *The verdict form: fifth and sixth assignments of error*

Weyerhaeuser's fifth and sixth assignments of error relate to the verdict form used by the court. First, Weyerhaeuser contends that, pursuant to the comparative fault statute, ORS 31.600, Five Star should have been included on the verdict form so that the jury could apportion fault to it. In particular, Weyerhaeuser relies on ORS 31.600(2), which states in part, "The trier of fact shall compare the fault of the claimant with the fault of any party against whom recovery is sought ***[.]" Weyerhaeuser argues that because plaintiffs sought recovery from Five Star in their complaint, the jury should have been given an opportunity to assign a fault percentage to it—even though Five Star defaulted and no evidence was presented at trial as to Five Star's potential fault.

In response, plaintiffs first contend that Weyerhaeuser failed to preserve its fifth assignment of error, and we agree.

---

[12] Weyerhaeuser did not object to those jury instructions.

In support of preservation, Weyerhaeuser asserts that it sought to have Five Star on the verdict form "both by submitting a proposed verdict form before trial, and by verbally confirming, before the verdict form was provided to the jury, that the court had rejected its request to include Five Star on the verdict form."

The record demonstrates that after instructing the jury, the trial court read to the jury the verdict form that it ultimately used. After the jury was excused for that day, the court asked the parties whether they had any objections. Stayton objected to the verdict form. The court explained that

"the court chose the verdict form for the reason that it spent approximately three hours last night and this morning with counsel, including during the noon hour, and counsel were not able to agree on the language in a special verdict form, in particular in regard to the specific questions concerning product liability, product liability verdict in this case.

"And so for that reason the trial judge * * * said we'll stick with the Uniform Instructions until someone in the appellate courts tell us that those are incorrect for use in a products liability case."

Stayton explained that it did not believe that the verdict form was appropriate for a strict products liability case because the verdict form was not adapted to the issues in such a case, such as the condition of the product and whether it was unreasonably dangerous when it left the manufacturer's "hands." Weyerhaeuser then joined in Stayton's objection, asking

"that the verdict form[] that is submitted by Weyerhaeuser be made a part of the court file. It's very similar to the one that Stayton * * * actually submitted, and we join with all of the concerns that they express now, as well as back when it was originally being contemplated."

Weyerhaeuser continued with further explanation as to why the verdict form did not match with strict products liability law, and then transitioned to its last objection:

"Also with the original verdict form that was submitted we requested that Five Star be added. I understand that was taken off by the court, and that plaintiffs' counsel

stipulated back in chambers that by removing it from the verdict form that it would not be a waiver of any argument Weyerhaeuser may make at a later date, offset from any sums obtained from Five Star Construction."

In short, the record does not establish that Weyerhaeuser properly preserved the argument it now makes on appeal. As we explained in relation to Weyerhaeuser's third and fourth assignments, one purpose of the preservation requirement is to allow the adversary to present its position and to permit the court to understand and avoid or correct the error, *Peiffer,* 339 Or at 656-57, and another is to give "opponents and the trial court enough information to be able to understand the contention and to fairly respond to it." *Walker,* 350 Or at 552. Although the parties and the court may have had a lengthy off-the-record discussion about the proper verdict form that included discussion of whether Five Star should be on the form because of ORS 31.600(2), the record on appeal contains nothing that demonstrates that Weyerhaeuser made such an argument to the trial court. All we are left with is evidence that Weyerhaeuser submitted a verdict form that had a place to allocate fault to Five Star. We cannot say that, in doing so, Weyerhaeuser provided the court with an explanation of its objection that was specific enough to ensure that the court could identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction was warranted. *See State v. Wyatt,* 331 Or 335, 343, 15 P3d 22 (2000).

In its sixth assignment of error, Weyerhaeuser declares that the verdict form used by the court likely confused the jury because it allowed the jury to assign liability on the basis of negligence, as opposed to strict products liability. Weyerhaeuser maintains that, given the difference in proof between claims for negligence and strict liability, the verdict form used was prejudicial.

The verdict form, as pertinent, stated:

"We, the jury, find:

"1a. Was * * * Stayton * * * at fault in one or more of the ways the plaintiffs claim?

"ANSWER: _____ (Yes or No)

"*  *  *  *  *

"1b.   Was * * * Stayton['s] * * * fault a cause of damages to the plaintiffs?

"ANSWER:   _____ (Yes or No)

"*  *  *  *  *

"2a.   Was * * * Weyerhaeuser * * * at fault in one or more of the ways claimed?

"ANSWER:   _____ (Yes or No)

"*  *  *  *  *

"2b.   Was * * * Weyerhaeuser['s] * * * fault a cause of damages to the plaintiffs?

"ANSWER:   _____ (Yes or No)

"*  *  *  *  *

"3a.   Was plaintiff Kevin Rains at fault in one or more of the ways claimed by * * * Stayton * * * and * * * Weyerhaeuser * * * ?

"ANSWER:   _____ (Yes or No)

"*  *  *  *  *

"3b.   Was plaintiff Kevin Rains' fault a cause of damages to the plaintiffs?

"ANSWER:   _____ (Yes or No)"[13]

Weyerhaeuser asserts that, instead of generically asking the jury if defendants were "at fault," the form should have tracked the elements of a claim for strict products liability and required the jury to indicate whether it found that (1) the defendants were sellers or manufacturers, (2) the product was in defective condition, (3) the product, in its defective condition, was unreasonably dangerous, and (4) the product reached the user without substantial change in the condition in which it was sold.

Weyerhaeuser acknowledges that the trial court properly instructed the jury with regard to the law of strict

---

[13] The verdict form also instructed the jury, depending on the answer to each question, to which question it should next proceed. It also asked the jury to assign a percentage of fault to each of the parties and to designate the amount of damages to plaintiffs.

products liability. Weyerhaeuser asserts, however, that when the instructions and the verdict form were considered together, the jury likely was confused, warranting reversal in this case. In particular, as noted, Weyerhaeuser contends that the verdict form was inconsistent with the law on strict products liability and may have confused the jury in regard to that claim.

Plaintiffs counter that there is no legal requirement that the verdict form ask the factfinder to answer a question on every element of a claim. Instead, plaintiffs contend that the trial court instructed the jury on "fault" in the context of Kevin's strict products liability claim and the comparative fault statute. Accordingly, plaintiffs assert that, when the jury instructions and the verdict form are considered together, there is no risk that the jury misunderstood its charge to determine liability based on strict products liability law. That is so because the jury, which is presumed to follow the court's instructions, would have understood that "fault" as used on the verdict form meant that a party was liable under the elements of strict products liability.

We agree with plaintiffs. When the verdict form is considered in conjunction with the jury instructions, it is not likely that the verdict form "created an erroneous impression of the law in the minds of the jurors" that "affected the outcome of the case." *Nolan v. Mt. Bachelor, Inc.*, 317 Or 328, 336-37, 856 P2d 305 (1993) (internal quotation marks omitted).

The elements of a strict products liability claim provided in ORS 30.920, are as follows:

"(1)   One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

"(a)   The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b)   The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased."

The trial court instructed the jury as to the meaning of "defective condition" and "unreasonably dangerous to the user or consumer." The court also instructed the jury "on the law of strict liability for a defective product," and that instruction touched on all the elements of a strict products liability claim. Also relevant is that the court instructed the jury on comparative fault. Weyerhaeuser does not take issue with the court's instructions on strict liability, so the heart of its argument is that, even though the jury was correctly instructed as to what had to be proved to establish strict products liability, use of the phrase "at fault" on the verdict form would have "probably created an erroneous impression of the law in the minds of the jurors which affected the outcome of the case." *Nolan*, 317 Or at 336-37 (internal quotation marks omitted).

As plaintiffs note, we generally presume that jurors follow jury instructions. *Bazzaz v. Howe*, 262 Or App 519, 526, 325 P3d 775 (2014). Given the content of the jury instructions, which exhaustively instructed the jury on the elements of a strict products liability claim and application of the comparative fault statute, we cannot agree with Weyerhaeuser that the court's use of a verdict form that required the jurors only to determine whether the parties were at fault was in error.

C. *Noneconomic damages: seventh assignment of error*

Weyerhaeuser's seventh assignment challenges the trial court's denial of its motion to reduce each plaintiff's noneconomic damages under ORS 31.710(1). ORS 31.710(1) caps noneconomic damages at $500,000 in most civil actions "arising out of bodily injury[.]" The trial court denied Weyerhaeuser's motion to apply the statutory cap, agreeing with plaintiffs that application of the cap in this case would violate Article I, section 17, of the Oregon Constitution.[14] Weyerhaeuser contends that ORS 31.710(1), as applied to Kevin's strict products liability claim and Mitzi's loss of consortium claim, does not violate Article I, section 17.

In the most recent Supreme Court case addressing ORS 31.710 and Article I, section 17, the court explained:

---

[14] Article I, section 17, provides: "In all civil cases the right of Trial by Jury shall remain inviolate."

"'Article I, section 17, guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases of like nature. In any such case, the trial of all issues of fact must be by jury. The determination of damages in a personal injury case is a question of fact. * * * The legislature may not interfere with the full effect of a jury's assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857[.]'"

*Klutschkowski v. PeaceHealth*, 354 Or 150, 177, 311 P3d 461 (2013) (quoting *Lakin v. Senco Products, Inc.*, 329 Or 62, 78, 987 P2d 463 (1999)) (ellipses and brackets in *Klutschkowski*). As the court indicated in *Klutschkowski*, under its precedent in *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), and *Hughes v. PeaceHealth*, 344 Or 142, 178 P3d 225 (2008), the state of the common law in 1857 bears on whether Article I, section 17, limits the legislature's authority to alter a cause of action or reduce the amount of a jury award. 354 Or at 168. Accordingly, Weyerhaeuser's seventh assignment of error requires us to examine the state of the common law in 1857, as it relates to the claims brought by plaintiffs. *Id.* at 169.

We begin with Kevin's claim for strict products liability. Weyerhaeuser maintains that Article I, section 17, is not implicated in this case because an action for strict products liability was not recognized in Oregon until 1967 in the case of *Heaton v. Ford Motor Co.*, 248 Or 467, 435 P2d 806 (1967), later codified by the legislature in 1979 as ORS 30.920. Or Laws 1979, ch 866, § 2. Weyerhaeuser acknowledges that an action for common-law negligence against a manufacturer of defective products existed in 1857, but differentiates such a claim from Kevin's strict products liability claim in several ways.

First, Weyerhaeuser asserts that, in ORS 30.920, the legislature created a cause of action that is separate and independent from a common-law negligence action for defective products. Second, Weyerhaeuser explains that the types of proof required to establish each claim are different. According to Weyerhaeuser, a plaintiff can establish strict products liability by demonstrating the existence of

a product defect that rendered the product unreasonably dangerous to persons or property, while a negligence claim based on a product defect requires proof that the product defect resulted from the manufacturer's negligence. Third, Weyerhaeuser explains that strict liability applies to all sellers and lessors in the product's chain of distribution; in contrast, the plaintiff must prove the negligence of each defendant from whom he seeks to recover under a common-law negligence theory. Finally, Weyerhaeuser claims that some damages that are recoverable in negligence—such as economic losses—are not recoverable in strict products liability, citing *State ex rel Western Seed v. Campbell*, 250 Or 262, 442 P2d 215 (1968), and *City of Medford v. Budge-McHugh Supply Co.*, 91 Or App 213, 754 P2d 607, *rev den*, 306 Or 661 (1988).

Plaintiffs take a different approach, arguing that strict products liability has origins in the common law, such that it is a case "of like nature" to those to which a right to a jury trial was customary in 1857. Plaintiffs rely on a statement in *State v. 1920 Studebaker Touring Car et al.*, 120 Or 254, 263, 251 P 701 (1926), that

> "the constitutional right of trial by jury is not to be narrowly construed, and is not limited strictly to those cases in which it had existed before the adoption of the Constitution, but is to be extended to cases of like nature as they may hereafter arise."

Plaintiffs posit that "cases of like nature" include actions for money damages that have common-law origins, as well as any modern variation of the common-law action. In line with that view, plaintiffs claim that the Supreme Court in *Stout v. Madden & Williams*, 208 Or 294, 300 P2d 461 (1956), traced the history of personal-injury claims based on defective products, and acknowledged that, as early as 1852, American courts recognized a claim without the need for privity between the manufacturer and the injured party. In addition, plaintiffs point to the Supreme Court's adoption of the *Restatement (Second) of Torts* section 402A (1965), in *Heaton*, 248 Or at 471-72, and contend that the *Restatement*, which was explicitly codified in ORS 30.920(3), derived from the common law.

Restating the parties' positions in more simple terms, they differ as to the meaning of the statement in the Supreme Court's prior cases that the cap would violate Article I, section 17, in "cases of like nature" to those causes of action that existed in 1857. Both parties acknowledge that, as of 1857, a party could recover in negligence for injuries sustained as a result of a product defect. For plaintiffs, that is enough—Kevin's strict products liability claim is simply a "right of action now clothed in statutory garb, but with common law origins." Weyerhaeuser counters that, given the substantial differences between the elements of a strict products liability claim and the common-law negligence product liability claim that existed in 1857, the legislative alteration of the amount of recoverable damages in a strict products liability claim does not run afoul of Article I, section 17.

Resolving this dispute is difficult given the state of the law. *See Klutschkowski*, 354 Or at 169 n 11 (acknowledging, but declining to address, the plaintiffs' argument that Article I, section 10, of the Oregon Constitution should protect common-law causes of action "not only as they existed in 1857 but also as those causes of action have evolved over time"); *id.* at 178-96 (Landau, J., concurring) (noting tension between cases addressing Article I, section 17, in relation to ORS 31.710, and the same constitutional provision when deciding whether a party has a right to a jury trial, *e.g.*, *Foster v. Miramontes*, 352 Or 401, 287 P3d 1045 (2012)). We ultimately conclude that Weyerhaeuser has the better argument because a claim under ORS 30.920 has very little in common with the type of product liability negligence claim that existed in 1857—even if the "origins" of a claim under ORS 30.920 are arguably found in the common law.

In resolving the issue, we find *Hughes*, 344 Or at 142, most instructive. There, the Supreme Court examined whether, as applied to the plaintiff's wrongful death action, the statutory cap on noneconomic damages violated Article I, section 17. The plaintiff argued that her action, although first established by statute in 1862, was "like" an ordinary common-law personal injury action and therefore entitled to a jury determination of damages without any cap. 344 Or at 155. The court disagreed, noting that "in 1857,

there was no clear common-law tradition with respect to the necessary elements of a wrongful death action, or who might bring such an action, or what sorts of damages would be recoverable, should such a cause of action be recognized." *Id.* at 156. Central to the court's decision in that case was that the amount of damages allowed in a wrongful death action, as a statute-based action enacted after 1857, had always been subject to legislative adjustment. *Id.* ("[T]here was no common-law rule defining the damages for wrongful death at all, much less one that identified the amount that would compensate a plaintiff for injuries resulting from the wrongful act.").

As explained below, we conclude that in 1857, there was no common-law tradition with respect to a strict products liability claim that could provide the basis for a conclusion that the legislature is prohibited by Article I, section 17, from altering the measure of damages available for such an action.

As a starting point, actions for strict products liability are governed by statute, not the common law. *Griffith v. Blatt*, 334 Or 456, 465-66, 51 P3d 1256 (2002) ("Oregon statutes, not the common law, govern plaintiff's strict liability claim and [the defendant's] defenses."). The relevant statute, ORS 30.920, provides the elements of a strict products liability claim:

> "(1)   One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:
>
> "(a)   The seller or lessor is engaged in the business of selling or leasing such a product; and
>
> "(b)   The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased."

ORS 30.920(2) provides that subsection (1) applies even when "[t]he seller or lessor has exercised all possible care" and the injured party has no contractual relationship with the sellor or lessor.

The common law, as it existed in 1857, did not recognize the type of action that is now codified in ORS 30.920. Although the recognition of negligence actions based on product defects generally predated the Oregon Constitution, *see Winterbottom v. Wright*, 152 Eng Rep 402 (1842), the general rule that developed during the mid-nineteenth century in the United States was that "the original seller of goods was not liable for damages caused by their defects to anyone except his immediate buyer, or one in privity with him." W. Page Keeton ed., *Prosser and Keeton on the Law of Torts* § 96, 681 (5th ed 1984). Almost immediately, exceptions to that general rule were carved out, including an exception that originated in the case of *Thomas v. Winchester*, 6 NY 397 (1852), which "held the seller liable to a third person for negligence in the preparation or sale of an article 'imminently' or 'inherently' dangerous to human safety." Keeton, *Prosser and Keeton on the Law of Torts* § 96 at 682. Nevertheless, the general rule, and the exceptions to that rule that developed in the nineteenth century, were all based in the common law of negligence.

In addition, the concept of strict liability for product defects did not develop in the law until the early twentieth century. Keeton, *Prosser and Keeton on the Law of Torts* § 97 at 690. The first acknowledged case that "discarded the requirement of privity of contract" in product liability negligence actions was a Washington case, but even that case was based on the legal theory of implied warranty. *Mazetti v. Armour & Co.*, 75 Wash 622, 135 P 633 (1913). In fact, the leap from negligence to strict liability in tort for manufacturers did not occur until *Greenman v. Yuba Power Products, Inc.*, 59 Cal 2d 57, 377 P2d 897 (1963), which was "immediately relied upon for the adoption of strict liability in tort throughout the country."[15] Keeton, *Prosser and Keeton on the*

---

[15] The policy justifications that developed to support strict liability in tort "can be condensed into about three ideas: (1) The costs of damaging events due to defectively dangerous products can best be borne by the enterprisers who make and sell these products. * * * (2) The cause of accident prevention can be promoted by the adoption of strict liability and the elimination of the necessity for proving negligence," and (3) even when fault or negligence is present, it is difficult to prove "and because of the costs of litigation, proof of the existence of fault or negligence in the sale of a defective product should no longer be required."

*Law of Torts* § 98 at 694; *see Heaton*, 248 Or at 470 (adopting tort theory of strict liability in Oregon).

Given that information, and acknowledging that Weyerhaeuser is correct that a strict products liability claim under ORS 30.920 differs in significant ways from a common-law negligence claim for a product defect, we cannot conclude that the legislature lacked authority, despite Article I, section 17, to define the right to recover for strict products liability actions, to decide who could recover, and to establish the nature of the damages that are recoverable. *See Hughes*, 344 Or at 156. Accordingly, the trial court erred in concluding that ORS 31.710(1) did not apply to Kevin's strict products liability claim, and we reverse and remand plaintiffs' limited judgment for correction of that error.

Next, we address the cap on noneconomic damages as applied to Mitzi's loss of consortium claim. There is little dispute that a common-law claim for loss of consortium predates 1857. Keeton, *Prosser and Keeton on the Law of Torts* § 125 at 931 (explaining that, by 1619, a husband could recover loss of consortium damages from a tortfeasor who had injured his wife). However, Weyerhaeuser points to *Sheard v. Oregon Electric Ry. Co.*, 137 Or 341, 2 P2d 916 (1931), which, in concert with prior decisions, held that at common law, a married woman could not sustain an action for the loss of consortium of her husband—even though a husband could sustain the same claim. In reliance on that case, and others like it, Weyerhaeuser contends that a wife's loss of consortium claim arising out of injury to her husband is not a claim that was recognized in 1857, and therefore, application of ORS 31.710 would not violate Article I, section 17.

As the Supreme Court explained in *Sheard*,

> "The reason why at common law a husband could recover for loss of consortium, but his wife could not, is historical in character. In the bygone generations when the customs, conduct, and belief of the English people were crystallizing themselves into the rules of human conduct which are now known as the common law, a woman was not regarded socially or civilly as the equal of her husband. * * *

Keeton, *Prosser and Keeton on the Law of Torts* § 98 at 692-93.

> Marriage operated as a suspension for most purposes of the legal existence of the wife."

137 Or at 345. Thus, as far as it goes, Weyerhaeuser is correct as to the state of the law in 1857. Nevertheless, as we explain below, we conclude that Article I, section 17, precludes application of ORS 31.710 to Mitzi's claim in this case.

ORS 31.710 violates Article I, section 17, in those classes of cases in which a jury trial was customary in 1857, or in cases of "like nature." *See Klutschkowski*, 354 Or at 177. In this case, that issue turns on the effect of the legal fiction that existed in 1857 that a married woman, because of her status, lacked legal standing to sustain a claim for loss of consortium. Simply stated, we conclude that, even though a woman's married status "operated as a suspension * * * on the legal existence of the wife," *Sheard*, 137 Or at 345, a married woman's loss of consortium claim is in the "class of cases" recognized at common law. That is, the injury sustained in this case—loss of consortium related to a spouse's injury—was recognized in 1857, and that is enough under our controlling precedent to conclude that Article I, section 17, prohibits the application of ORS 31.710(1) to Mitzi's loss of consortium claim. *See Klutschkowski*, 354 Or at 176 (examining whether the common law recognized a right to recover for the injuries sustained in a medical-malpractice case).

D. *Stayton's indemnity claim: tenth assignment*

In its tenth assignment of error, Weyerhaeuser challenges the trial court's entry of the limited judgment for Stayton on its indemnity claim, arguing that Stayton produced no evidence that it had "bought peace" for Weyerhaeuser by extinguishing any of Weyerhaeuser's liability to plaintiffs.

To establish a common-law indemnity claim, the indemnity plaintiff must plead and prove:

> "(1) [it] has discharged a legal obligation owed to a third party; (2) the defendant was also liable to the third party; and (3) as between the [plaintiff] and the defendant, the obligation ought to be discharged by the [defendant]."

*Fulton Ins. v. White Motor Corp.*, 261 Or 206, 210, 493 P2d 138 (1972), *overruled in part on other grounds by Waddill v. Anchor Hocking, Inc.*, 330 Or 376, 8 P3d 200 (2000). To prove the "discharge a legal obligation" element, the indemnity plaintiff must show that it has discharged an obligation owed to the third party so as to extinguish its own and the indemnity defendant's liability. *Savelich Logging v. Preston Mill Co.*, 265 Or 456, 460, 509 P2d 1179 (1973). The issue in this case turns on what it means to "discharge an obligation owed to a third party" and whether Stayton did so.

The parties do not dispute the state of the record as it relates to this assignment. Stayton entered into the agreement with plaintiffs, which limited Stayton's financial exposure to plaintiffs, but kept Stayton in the action as a defendant through trial. The jury returned a verdict against Stayton and Weyerhaeuser. Stayton and Weyerhaeuser had agreed that the court would determine Stayton's indemnity claim after the jury trial, and the court decided that issue in Stayton's favor. Accordingly, the court entered a limited judgment for plaintiffs against Stayton and Weyerhaeuser on May 28, 2010, and on that same day, entered a limited judgment for Stayton against Weyerhaueser for indemnity in the amount of $2 million. Stayton acknowledges that, at the time the court entered the indemnity judgment, Stayton had presented no evidence that it had made any payment to plaintiffs on their judgment or under the terms of the agreement. Stayton also acknowledges that nothing in the agreement explicitly addressed Weyerhaeuser's liability to plaintiffs.

Weyerhaeuser contends that Stayton could have proved that it had discharged a legal obligation owed to a third party if it had introduced evidence that it (1) had actually paid plaintiffs' judgment against Stayton, which would have, in turn, extinguished some of Weyerhaeuser's liability to plaintiffs, or (2) "bought peace" for Weyerhaeuser in the settlement agreement through a release by plaintiffs of at least some portion of Weyerhaeuser's liability to them.

Stayton disagrees, contending that actual discharge of its obligation to plaintiffs is not required to prove a common-law indemnity claim and that the trial court

was therefore authorized to enter the limited judgment for Stayton. In so arguing, Stayton contends that

> "[t]he agreement set the amount that Stayton would owe plaintiffs depending on the jury's verdict. The agreement did not purport to discharge anyone's liability because any payment by Stayton made pursuant to its terms would be made pursuant to a judgment which, of course, plaintiffs eventually obtained against Stayton and Weyerhaeuser."

We understand Stayton to be asserting that the limited judgment entered for plaintiffs was the source of Stayton's obligation to plaintiffs, not the agreement, and, in that circumstance, whether the settlement agreement "bought peace" for Weyerhaeuser is irrelevant. Instead, Stayton maintains that ORCP 22, as understood and, applied in two of our previous cases, *Kahn v. Weldin*, 60 Or App 365, 653 P2d 1268 (1982), *rev den*, 294 Or 682 (1983), and *Freeport Investment Co. v. R. A. Gray & Co.*, 94 Or App 648, 652-53, 767 P2d 83, *rev den*, 308 Or 33 (1989), contemplates entry of a judgment before any payment is actually made by a fellow debtor on a *judgment*. Stayton maintains that we recognized in those cases that "[t]he discharge requirement * * * was abrogated by ORCP 22 C(1)" and a third-party indemnity plaintiff is "entitled to judgment" on an indemnity claim even when it had not yet discharged any joint legal obligation to the original plaintiff. In other words, Stayton contends that it need not have made any actual payment to plaintiffs in order for the court to have properly entered judgment on its indemnity claim, as long as it had established that eventual payment to plaintiffs pursuant to the judgment would reduce Weyerhaeuser's obligation to plaintiffs.

As we explain below, we disagree with Stayton's view of the law. Although we acknowledge that ORCP 22 C may have an effect on the appropriate timing of entry of an indemnity judgment in a case like this, we ultimately conclude that the rule does not "abrogate" the discharge element or allow the trial court to enter an executable judgment without proof of actual discharge. Instead, ORCP 22 C might have allowed the court to enter a *conditional* judgment for Stayton after it concluded that Weyerhaeuser should indemnify Stayton, but that did not happen in this case.

Regardless, we conclude that the "discharge a legal obligation" element in the circumstances presented in this case required Stayton to prove either (1) it had actually paid plaintiffs pursuant to the limited judgment against Stayton and Weyerhaeuser or (2) its settlement agreement with plaintiffs "bought peace" for Weyerhaeuser. Because Stayton acknowledges that, at the time that the trial court entered the judgment for Stayton, neither (1) nor (2) had occurred, it was error for the trial court to enter an executable judgment at that time. It may have been appropriate for the court to enter a conditional judgment for Stayton, subject to execution upon proof of actual discharge by Stayton of Weyerhaeuser's liability to plaintiffs, but there is no indication that that is what happened here.

We begin with Stayton's contention that the court could enter the indemnity judgment without proof that Stayton had discharged any of Weyerhaeuser's legal obligation to plaintiffs. First, it relies on *Kahn* and *Freeport* to advance the argument that the court could enter an indemnity judgment without evidence that, at that time, Stayton had discharged any obligation owed to plaintiffs. In doing so, Stayton argues that, when an indemnity claim is brought pursuant to ORCP 22 C, "discharge" is not required before the trial court can enter a judgment for indemnity.

The Supreme Court in *Savelich* recognized that, barring some other form of release of liability, actual payment of a judgment is necessary to discharge a liability so as to entitle the indemnity plaintiff to indemnity from the indemnity defendant. 265 Or at 466. In *Savelich*, the court first concluded that a settlement agreement entered into between the indemnity plaintiff and the plaintiff in the underlying action had not released whatever claims the plaintiff might have had against the indemnity defendant. *Id.* Accordingly, the indemnity plaintiff had failed to satisfy the discharge element through the execution of the settlement agreement with the plaintiff. The court then noted that the indemnity plaintiff had not "made any payment which reduces their potential liability[,]" and concluded that the indemnity plaintiff had not discharged any liability to the plaintiff so as to allow indemnity. *Id.*

That understanding of the discharge element—that actual payment is required before an indemnity plaintiff has a right to indemnity—has not since been called into question by any Oregon cases and is consistent with the treatment of the issue in the *Restatement (Third) of Torts* § 22 comment b (2000) (explaining that an indemnitee may extinguish the liability of the indemnitor "by a settlement with the plaintiff that by its terms or by application of law discharges the indemnitor from liability or by satisfaction of judgment that by operation of law discharges the indemnitor from liability"). In addition, contrary to Stayton's assertions, nothing in the law leads to the conclusion that ORCP 22 C has abrogated that requirement.

ORCP 22 C(1) provides, in relevant part:

"After commencement of the action, a defending party, as a third party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third party plaintiff for all or part of the plaintiff's claim against the third party plaintiff[.]"

As we have stated, ORCP 22 C is a rule of procedure and has not altered the substantive law of common-law indemnity. *Marton*, 256 Or App at 561-62. Neither *Freeport* nor *Kahn* held differently.

In *Kahn*, the Kahns had sued the Weldins and other parties, including Kirsten Corporation for a debt owed. 60 Or App at 367. As a result of that litigation, the trial court entered judgment in favor of the Kahns on all claims against all defendants; that judgment was not appealed. *Id.* However, Kirsten Corporation had brought a cross-claim for indemnity and contribution against the Weldins and the court had entered judgment denying that cross-claim from which Kirsten appealed. *Id.* On appeal, the Weldins argued that Kirsten had failed to plead and prove its indemnity cross-claim because it had not paid the judgment to the Kahns, thus it had not discharged the legal obligation. *Id.* at 371.

This court noted that the purpose of the third-party pleading rule, ORCP 22, was to "promote the expeditious and economical adjudication in a single action of the entire subject matter arising from a set of facts, including claims

contingent on the determination of other issues in the case." *Id.* Accordingly, we stated, "To require a defendant who raises an indemnity cross-claim to plead and prove actual discharge of a judgment before the judgment is entered against the defendant raising it would contravene the purpose and destroy the usefulness of the cross-claim rule." *Id.* The *Kahn* court concluded, therefore, that the indemnity claim was properly presented to the trial court, was decided in the trial court's judgment, and was properly before the court on appeal. *Id.* at 371-72.

In our view, *Kahn* stands for a proposition that we recently restated in *Marton*: "ORCP 22 is a *procedural* rule that affects the timing—not the elements—of third party claims."[16] 256 Or App at 561 (emphasis in original). As we explained, "[i]n other words, ORCP 22 allows parties to accelerate the determination of contingent liability; it does not provide an independent source of liability or alter the nature of the underlying claims in a third-party case." *Id.* at 562. Given that understanding, *Kahn* does not support Stayton's position that ORCP 22 C "abrogated" the discharge element, thus allowing the court to *enter* an executable judgment without evidence that Stayton had satisfied the first element of a common-law indemnity claim.

*Freeport* is similarly unavailing to Stayton. In that case, the plaintiff in an earlier action, Klimp, had sued Freeport for breach of contract related to construction defects. 94 Or App at 650. In that action, Freeport had brought a third-party claim against Gray that would result in Gray's indemnification of Freeport for any recovery that Klimp might obtain against Freeport. The trial court in the original action concluded that the building was deficient and that the defects in the building were the result of Gray's breach of contract with Freeport. *Id.* at 650-51. Nevertheless, the court refused to award Freeport damages from Gray in indemnity, at least in part because it determined that Freeport had not discharged any legal obligation

---

[16] The *Restatement* at § 22 comment b recognizes this distinction, stating that "[a]n indemnitee may, however, assert a *claim* for indemnity and obtain a contingent judgment in an action where the indemnitee is sued by the plaintiff as permitted by procedural rules, even though liability of the indemnitor has not yet been discharged."

to the Klimps. *Id.* at 651. Freeport did not appeal from that ruling; instead, it brought a separate action for breach of contract. The trial court granted summary judgment for Gray in that separate action on *res judicata* grounds and Freeport appealed. *Id.*

As part of that appeal, Freeport argued that, under ORCP 22 C, its third-party breach of contract claim was improperly brought and was not capable of being decided in the prior action. We noted that ORCP 22 C abrogated the requirement of separate actions, explaining that ORCP 22 C was patterned after the federal impleader rule, FRCP 14(a), which was "designed to decide contingent liability as well as primary liability and the third-party claim can accelerate determination of the liability, if any, between the third-party plaintiff and the third-party defendant." 94 Or App at 652-53 (internal quotation marks omitted). The court continued, quoting a federal Eighth Circuit Court of Appeals case, that "'[a]s a prerequisite to that contingency, a court may grant a conditional judgment against the third-party defendant that does not become enforceable until the third-party plaintiff is otherwise determined to be entitled to judgment or payment of the judgment.'" *Id.* (quoting *Williams v. Ford Motor Credit Co.*, 627 F2d 158, 160 (8th Cir 1980)).

Based on that understanding of the law, we stated that "[u]nder ORCP 22 C, Freeport's third-party claim accelerated the determination of Gray's liability. Because the court made findings favorable to Freeport on its breach of contract claim, and its damages were ascertained on the findings made, Freeport was entitled to a judgment against Gray in the prior action." *Id.* at 653.

Stayton maintains that, under *Freeport*, (1) "the discharge requirement * * * was abrogated by ORCP 22 C(1)" and (2) Freeport was "entitled to judgment" on the third-party indemnity claim that it had brought in the prior action, even though it had not yet discharged any legal obligation on the underlying judgment. *Freeport* does not stand for the former proposition. The court in *Freeport* never stated that ORCP 22 C abrogated the "discharge requirement"; it simply held that the requirement of separate actions had been abrogated. Moreover, as we have

since reaffirmed, ORCP 22 C is a procedural rule that did not alter the substance of a common-law indemnity claim. *Marton*, 256 Or App at 561.

The court's statement that Freeport was "entitled to judgment" ultimately does not go as far as Stayton's contention that the "discharge requirement" was not required in this case for the trial court to enter the indemnity judgment. Stayton's understanding of the court's statement that Freeport was "entitled to judgment" ignores the context of that statement. We reached that conclusion after acknowledging that federal impleader is designed to accelerate the determination of liability and that "a court may grant a conditional judgment against the third-party defendant that does not become enforceable until the third-party plaintiff is otherwise determined to be entitled to judgment or payment of the judgment." *Freeport*, 94 Or App at 653. Given the context of the court's statement, we understand it to mean that Freeport would have been entitled to a conditional judgment against Gray in the earlier action and that that conditional judgment would not have been enforceable until Freeport was determined to be entitled to judgment— presumably by demonstrating that it had satisfied the elements of its common-law indemnity claim. Accordingly, we do not understand *Freeport* to have altered the substance of a common-law indemnity claim to abrogate the "discharge requirement."[17]

Instead, *Freeport* concluded that ORCP 22 C is intended to "accelerate the determination of liability" for third-party claims and further suggests that the rule allows a court to "grant a conditional judgment against the third-party defendant" that is not immediately enforceable. Even assuming that ORCP 22 C authorized the trial court to enter a conditional judgment in this case, that is not what happened here. Instead, the court entered an executable judgment without evidence that Stayton had satisfied the first element of its common-law indemnity claim. Accordingly, the trial court erred in entering Stayton's limited judgment.

---

[17] We reject without discussion Stayton's second argument that it was entitled to the limited judgment for $2 million merely because it incurred some defense expenses. In addressing Weyerhaeuser's twelfth and thirteenth assignments of error, we examine the validity of the general judgment awarding Stayton its defense costs.

E. *Stayton's defense expenses: twelfth and thirteenth assignments of error*

Finally, in its twelfth and thirteenth assignments, Weyerhaeuser challenges the trial court's general judgment that awarded Stayton's defense expenses against Weyerhaeuser in indemnity. Following trial, and after the trial court had entered the limited judgment on Stayton's indemnity claim, the trial court determined that Weyerhaeuser should indemnify Stayton for the expenses that Stayton had incurred in defending plaintiffs' claims.

Weyerhaeuser's argument in its twelfth assignment of error is narrow. It asserts that Stayton failed to prove two prerequisites for obtaining indemnity for its defense expenses. First, according to Weyerhaeuser, the court could award defense costs in indemnity only if Weyerhaeuser had "wrongfully" refused to defend Stayton from plaintiffs' claims. Second, Weyerhaeuser contends that Stayton's tender of defense was untimely, which Weyerhaeuser asserts precludes an award of defense expenses to Stayton. Stayton counters that the law does not contain a "wrongful refusal" requirement, nor is there a specific requirement in the law that an indemnity plaintiff "timely tender" its defense in a case like this one. Stayton also disputes whether its tender was in fact untimely.

We agree with Stayton that the authority on which Weyerhaeuser relies does not establish that defense expenses are recoverable in indemnity only if the indemnity defendant wrongfully refused to defend the indemnity plaintiff in the action brought by the original plaintiff. Weyerhaeuser simply points us to *C.I.T Group/Equipment Financing, Inc. v. Young*, 99 Or App 270, 782 P2d 169 (1989), *rev den*, 309 Or 521 (1990), presumably for the proposition that it now raises. In that case, we stated that "[l]egal expenses may also be recovered from an indemnitor for wrongful refusal to defend an indemnitee." *Id.* at 272. Taken in context, however, that statement was intended to say no more than wrongful refusal to defend *may* give rise to recovery from an indemnitor. Accordingly, the court in *Young* did not establish that a party can recover defense costs in indemnity only if the indemnitor wrongfully refused to defend the indemnitee.

And, we are aware of no other case that has established such a legal prerequisite to recovering defense expenses in all indemnity cases seeking defense costs. *See PGE v. Const. Consult. Assoc.*, 57 Or App 116, 120, 643 P2d 1334 (1982) (holding that in an indemnity action seeking defense costs "[i]t is sufficient that the indemnitee plead and prove that it was sued, reasonably incurred costs in defending and that, as between it and the putative indemnitor, the indemnitor should bear the burden of the defense").

We also agree with Stayton that the trial court did not err in awarding defense costs even though Stayton tendered its defense to Weyerhaeuser 18 months after it served its third-party complaint. Based on the authorities presented by Weyerhaeuser to the trial court in support of its contention, none of which bear on whether a timely tender affects the trial court's ability to award defense costs in the circumstances presented in this case, we cannot say that the trial court erred in awarding defense costs because of the timing of Stayton's tender of defense.

In its final assignment of error, Weyerhaeuser asserts that the trial court erred in awarding Stayton defense expenses incurred while prosecuting its indemnity claim. On appeal, Weyerhaeuser argues that the "recovery of attorney fees on an indemnity claim is limited to fees incurred in defense of the claim from which the claimant is seeking indemnity, and not fees incurred in connection with litigation over the entitlement to indemnification." Accordingly, Weyerhaeuser asserts that the trial court erred "in awarding the entire amount of Stayton's requested defense expenses, ignoring any distinction between expenses incurred relative to Stayton's defense of plaintiffs' claims as opposed to its prosecution of the indemnity claims."

The most glaring problem with Weyerhaeuser's assignment of error is that its argument is not preserved—at least with respect to the majority of the expenses awarded. Several months after trial, Stayton sought defense costs in the amount of $248,327.20, which represented costs incurred from the date Stayton served its third-party complaint on Weyerhaeuser through a date six weeks after the jury verdict. Weyerhaeuser objected, arguing several points, none of

which included the argument Weyerhaeuser now makes in this assignment.[18] Subsequently, the court held a hearing at which Weyerhaeuser advanced additional authorities in support of its written objections, but again did not advance the argument it now makes. The trial court later issued an extensive letter opinion that rejected each of the arguments that Weyerhaeuser made in its objection and awarded Stayton the full amount of expenses requested.

In the meantime, after the hearing but before the trial court issued its letter opinion on the original request, Stayton filed a supplemental request, seeking expenses of $17,657.12 that it had incurred since the date that it filed its original request. Weyerhaeuser objected to the supplemental request, reiterating some of the objections it made to Stayton's original request and for the first time raising the argument that it now makes on appeal—that any expenses sought related to prosecution of its indemnity claim cannot be recovered. However, Weyerhaeuser's argument in that vein was explicitly limited to an objection to the supplemental request and was also limited to challenging expenses based on the argument that Stayton had settled the claims for which it seeks indemnity when it entered into the agreement with plaintiffs. Alternatively, Weyerhaeuser argued that it should not be obligated to pay for expenses related to Weyerhaeuser's appeal or for "post-verdict" disputes between Stayton and plaintiffs arising out of the settlement agreement. Specifically, Weyerhaeuser objected to $4,003 in

---

[18] Specifically, Weyerhaeuser first argued that Stayton was not entitled to recover fees and costs incurred prior to its tender of defense because the tender was untimely. Second, Weyerhaeuser argued that Stayton was not entitled to recover costs related to its prosecution of third-party claims against parties that were not Weyerhaueser. Third, Weyerhaeuser maintained that Stayton was not entitled to costs incurred after it entered into the agreement with plaintiffs because, according to Weyerhaeuser, "those expenses were not incurred to defend [Stayton] from plaintiffs' claims." That is, because there was no longer a justiciable controversy between Stayton and plaintiffs, Weyerhaeuser should not have to pay for expenses incurred after that date. Fourth, Weyerhaeuser objected to specific costs, such as deposition-related costs, overhead expenses, and electronic research costs, as not recoverable under ORCP 68. Finally, Weyerhaeuser objected to any recovery by Stayton of costs and fees incurred to defend itself from the "portions of plaintiffs' claims that were directed at [Stayton's] conduct." Weyerhaeuser specifically noted any costs related to plaintiffs' negligence claim against Stayton, and any costs related to allegations that it had altered the defective board prior to distribution.

expenses related to the appeal and settlement agreement disputes.

Given that history, we conclude that Weyerhaeuser has preserved its challenge, on the basis it now raises, only to $4,003 in expenses sought by Stayton in its supplemental request. For one, the argument that Weyerhaeuser makes on appeal was not presented to the trial court for it to consider when evaluating Stayton's original request. And second, Weyerhaeuser's argument was explicitly linked to expenses sought in Stayton's supplemental request.

Stayton concedes, as it did in the trial court, that the trial court should not have awarded $1,512 in appeal-related fees and that the general judgment should be reversed and remanded for a reduction in that amount. We accept Stayton's concession on that point, and reverse and remand the general judgment for a reduction of $1,512.

However, we reject Weyerhaeuser's other argument, that the trial court erred in awarding $2,491 in expenses related to "post-verdict" disputes between Stayton and plaintiffs. In short, Weyerhauser has not provided any argument as to why the expenses that it apparently identified below as objectionable could not be awarded by the trial court as expenses "incurred in defense of the claim from which the claimant is seeking indemnity." Weyerhaeuser's conclusory statement of proposed law, without any attempt to develop the argument, or any attempt to explain how the facts might apply to such an argument, precludes meaningful review of that issue. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

## III. CONCLUSION

In summary, we reverse and remand the limited judgment entered for plaintiffs against Stayton and Weyerhaeuser for the trial court to apply the statutory cap

on noneconomic damages to Kevin's strict products liability claim; we reverse the limited judgment entered for Stayton on its indemnity claim; and we reverse and remand the general judgment for the trial court to reduce the judgment by $1,512.

Plaintiffs' limited judgment reversed and remanded for application of ORS 31.710(1) to plaintiffs' strict products liability claim, otherwise affirmed; Stayton Builders Mart's limited judgment for indemnity reversed; general judgment reversed and remanded with instructions to reduce the judgment by $1,512, otherwise affirmed.